[No. 6,614.—In Bank.]
March 1, 1882.

## OAKLAND BANK OF SAVINGS *v.* P. S. WILCOX.

OVERDRAFTS—LIABILITY OF OFFICERS OF A BANK—INSTRUCTIONS—USAGE.— Action by a bank against its President for the amount of overdrafts of one C., alleged to have been drawn for the benefit of the business of a hotel in which the defendant and C. were jointly interested, and to have been paid by direction of the defendant. The verdict and judgment were for the plaintiff. The evidence tended to show that the money was drawn for use in the joint business as alleged; that C. was induced by the defendant to open an account with the bank, and that at various times, from April 1st to July 9th, overdrafts of C. were paid by direction of defendant; that at the latter date (the account then showing a balance in favor of C.) defendant, by reason of ill-health, left the city, and was absent from the bank till July 30th, but before absenting himself did not give instructions to the Cashier not to pay overdrafts; that during his absence the overdrafts in question were made and paid by the Cashier; that according to the by-laws of the plaintiff it was the duty of the Finance Committee to pass upon and to allow or refuse all loans. The Court instructed the jury in effect, that if the overdrafts of C. during the months of April, May, and June, were authorized by the defendant it was the duty of defendant, upon absenting himself, to instruct the Cashier to discontinue paying the overdrafts of C.; that the question was: were the overdrafts made in the month of July, which were lost to the bank, paid by the Cashier in the course of a dealing established and inaugurated by the defendant, or were they paid by the Cashier contrary to or against the express directions of the defendant; also, that a usage at the bank (of which there was some evidence before the jury) to allow customers to overdraw, would not justify an officer of the bank in case of loss; that such usage was nothing more than a usage or practice to misapply the funds of the bank.

*Held*, The law as applicable to this case was, in substance, correctly given by the Court below. There were, substantially, but two questions for the jury to consider, viz.: 1. Did Wilcox inaugurate the account and its method of being carried on, and direct officers of the bank to pay overdrafts, and were the amounts of overdrafts after July 9th paid in pursuance of and as a part of the method inaugurated by Wilcox? 2. Was he interested in the business of the hotel, and in maintaining it? These questions answered in the affirmative fix the liability upon him, and to sustain such answers the evidence is ample.

ID.—ID.—ID.—IMMATERIAL ERROR.—An instruction indicating that all overdrafts, under all circumstances, constitute fraud, and also an instruction that "if he (the president) should fail in skill," he would be responsible, *held* to be incorrect, but in view of the actual issues involved, not calculated to injure the defendant.

ID.—ID.—BY-LAWS.—Where the by-laws of a bank forbid loans to be made without the approbation of the finance committee, it is a violation of duty for the President or Cashier to loan upon his or their own judgment.

ID.—ID.—BREACH OF TRUST—FIDUCIARY.—An officer of a bank can not make profit to himself out of the loans made by him of the money of the bank, and if losses occur in the attempt he must bear the losses.

ID.—ID.—INSTRUCTIONS.—There was no error in refusing the instructions asked for by defendant and refused.

APPEAL from a judgment for the plaintiff, and from an order denying a new trial in the Third District Court, County of Alameda. McKEE, J.

The instructions asked by the defendant and refused by the Court are as follows:

1. "This action is brought to recover the sum of four thousand five hundred seventy-three and thirty-five one hundredths dollars, on the ground that defendant, Wilcox, connived with one Charles W. Carter, and requested said Carter to draw checks on the plaintiff when he had no money on deposit with it, which checks the defendant, as President of the plaintiff, and with the intent to defraud it, ordered paid."

2. "Fraud is an intent, 'not criminal,' unlawfully, designedly, and knowingly, to appropriate the property of another. Before you could find a verdict for the plaintiff, therefore, you must find that the agreement between Carter and the defendant, in regard to the obtaining of money from the plaintiff (if there was any), was made with the intent, 'not criminal,' upon the part of the defendant to unlawfully, designedly, and knowingly appropriate the property of plaintiff for the im-

provement of the Grand Central Hotel, of which the defendant was a part owner."

· 3. "The officers of a corporation are not personally liable for loss to the funds through a mere error, unless there has been negligence or fraud."

*McAllister & Bergin*, for Appellant.

From the statement already made the Court will observe that all overdrafts previous to July, 1875, and those for recovery of which this action was brought, were made subsequently to the sickness and during the absence of Wilcox from the bank.

The gravamen of this complaint, therefore, rests upon the averment that "at various times, said Carter, with the connivance, consent, and at the request of said Wilcox, drew checks upon plaintiff for money when he had no money on deposit with plaintiff, which checks were with the knowledge, consent, and connivance of defendant, and by his orders duly paid by the Cashier of plaintiff." This is denied, and we submit that there is no proof to sustain it. The instructions of the Court were erroneous and calculated to mislead the jury. The first and second portions of the instructions excepted to were clearly calculated to mislead, in view of the issues before the jury.

Note.—These instructions are as follows :

"They (the bank officers) are bound in law to exercise reasonable skill and ordinary care and diligence." Also, "If he (President of the corporation) should transcend or abuse his powers; if he should fail in skill, or omit ordinary care and diligence, or be guilty of any wrongful or fraudulent act in discharging his duties, in consequence of which a loss results to the bank, he is responsible in law for it." The instructions generally were erroneous.

As to measure of liability of Directors to corporation, see *Spring's Appeal*, 71 Pa. St. 20 ; *Scott* v. *Depeyster*, 1 Edw. Ch. 541 ; *Percy* v. *Millaudon*, 20 Mart. (La. 68) ; *Hodges* v. *N. E. Screw Co.*, 1 R. I. 312 ; Whart. Neg., § 510 ; *Leffman* v. *Flannigan*, 5 Phila. 150 ; *Maisch* v. *Savings Fund*, id. 30 ; *Railroad Co.* v. *Bridges*, 7 B. Mon. 558 ; *Godboldt* v. *Branch Bank*,

11 Ala. 191; *Shea* v. *Knoxville and Ky. R. R. Co.*, 6 Bax. 277; *Dunn* v. *Kyle*, 14 Bush (Ky.), 134.

In *Commercial Bank of Albany* v. *Ten Eyck*, 48 N. Y. 310, the Court say: "I do not, however, assent to the claim of the counsel for the appellant, that a cashier, in all cases, becomes personally liable when he permits an overdraft. It is not an an uncommon thing for bankers to permit overdrafts, with an understanding that the account should be made good before the close of banking hours on that day or soon after; and whether such overdrafts are prudent or not, depends upon the character and standing of the drawer, and upon the circumstances of each case."

The instructions of the Court, in the case at bar, are manifestly opposed to this plain principle of justice. Under the instructions of the Court an overdraft makes the officer liable regardless of good faith, sound judgment, or the highest exercise of prudence; it makes him insurer, not for good faith, etc., but for the absolute payment of the money. This is not in accord with common experience, and is a measure of liability not exacted of any officer of a bank. The true rule is stated by the Court of Appeals in the extract cited.

The first and second instructions asked for defendant are correct, and should have been granted.

The third instruction is correct, and should have been given.

*E. W. McGraw*, for Respondent.

This Court will, of course, consider the instructions as a whole, and it will be more convenient to discuss them as a whole, and in the discussion of them, before considering the language used by the Court, we will state our view of the legal principles which underlie the case.

That the utmost good faith is exacted from Directors and other officers of corporations in their dealings with such corporations or the property thereof, is a rule too well known to require the fortification of authority.

But the application of that rule in various cases, under circumstances having more or less resemblance to those we have recited, will fully justify the charge of the Court in the case at bar.

The general duty which the defendant owed to plaintiff is clearly and succinctly stated in Morse on Banking (2d ed.), 114, 115. (*German Savings Bank* v. *Wulfekuhler*, 19 Kan. 60.)

As to the illegality and fraudulent nature of overdrafts without security, there is no difference of opinion among jurists, whatever may be the opinion of bankers.

The drawing of a check without funds to meet it, is a fraudulent act. (*True* v. *Thomas*, 16 Me. 36; *Peterson* v. *Union National Bank*, 52 Pa. St. 208; *Minor* v *Mechanics' Bank*, 1 Pet. 72; *Eichelberger* v. *Finley*, 7 Har. & J. 387; *Bank of St. Mary's* v. *Calder*, 3 Strobh. 408; *Lancaster Bank* v. *Woodward*, 18 Pa. St. 362.)

That an officer of a bank is liable for money lost to the bank through his gross negligence, misconduct, or connivance, is beyond dispute. (*Robertson* v. *Smith*, 3 Paige, 231; *Shear* v. *K. & K. R. R. Co.*, 6 Baxter (Tenn.), 278; Cooley on Torts, 522; *Shea* v. *Mabry*, 1 Lea (Tenn.), 319.)

The instructions excepted to gave to the jury the law of the case in exact accordance with the decisions we have noticed. Those portions of that instruction italicized as above, are assigned as errors. We submit they are good sense as well as good law. It is not denied that Carter's credit at the bank was established by defendant. That up to the eighth of July, all overdrafts had been made with his sanction, or by his express wishes. That he had facilities possessed by no other officers of the bank for ascertaining the exact financial *status* of Carter. Any man of common business prudence doing business on his own account, who had been in the habit of giving credit to a doubtful customer, would, on the eve of absence from business, instruct his clerks or salesmen as to the continuance or limitation of that credit. A failure to do so, in case he wished the credit to be discontinued, would be gross negligence. (Brown's Legal Maxims, 329; *Richardson* v. *Kier*, 34 Cal. 75.)

As we have seen, the law condemns negligence in the performance of the duties of a President of a bank. If any reasonable man in the conduct of his own business, would, under similar circumstances, have given the notice suggested by the Court, then the law exacted that notice of defendant, and the charge of the Court below was correct.

The notice was necessary not only to absolve the defendant from the charge of negligence, but to clear him from the taint of fraud which attaches to the transaction, by reason of the personal interest of the defendant in these very overdrafts, the payment of which he is seeking to avoid.

MYRICK, J.:

This is an action to recover four thousand five hundred and seventy-three dollars and thirty-five cents and interest, for the overdrafts of one Carter drawn upon the plaintiff. The complaint alleges that defendant was President of plaintiff, and as such its executive officer and general agent; that he and Carter were interested in carrying on a hotel, defendant being interested in the profits; that Carter was without means; that he had no money deposited with plaintiff, but, having occasion to use money in the business of the hotel, was induced by defendant to draw checks upon plaintiff and to open an account with plaintiff; that defendant, in violation of his duty to plaintiff, directed and caused the Cashier of plaintiff to pay the checks of Carter, and that by reason thereof the account of Carter was overdrawn to the amount sued for.

The case was tried by a jury, and a verdict was rendered for plaintiff for the full amount above named. Defendant's motion for a new trial being denied, he appealed.

Evidence was given tending to show that the defendant and one Reese were the owners of a hotel, and that an arrangement was made between defendant and Carter in accordance with which Carter obtained from Reese a lease of the undivided half of the hotel, and defendant gave to Carter a lease of the other half, and Carter was to and did carry on the business of keeping the hotel, he paying Reese six hundred dollars for rent of one half, defendant to share in the profits of the business for his rental; that Carter had no money to pay the rent to Reese, and defendant induced him to draw a check upon the plaintiff for the first month's rent, which check defendant directed the Cashier of plaintiff to pay; that in carrying on the business it was necessary for Carter to have money, and in order to obtain it, defendant induced Carter to open an account with plaintiff and take a pass-book,

and directed the officers of plaintiff to open an account and issue the pass-book; that from time to time deposits were made and checks were drawn, resulting as follows: From April 1, 1875, to April 11th, the account was overdrawn; April 12th, a small balance in favor of Carter; April 13th, a small amount overdrawn; from April 14th to May 17th, balances in favor, on several days being over four thousand dollars; May 18th to May 24th, overdrafts, ranging from one hundred and thirty-four to over six hundred dollars; from May 25th to June 13th, balances in favor, ranging from three hundred and four dollars to over three thousand dollars; June 14th to June 30th, overdrafts ranging from over three hundred dollars to over two thousand dollars; from July 1st to July 9th, balances in favor, ranging from two hundred and eighty-three dollars to one thousand five hundred and thirty-four dollars; from July 10th to July 29th, overdrafts, beginning with one thousand one hundred and twenty-one dollars and ninety-six cents and reaching four thousand four hundred and forty-five dollars and twenty-three cents, when the account was stopped and payment of checks was refused; that when Wilcox was at the bank at the times checks overdrawing the account came in, it was the custom of the Cashier to show them to defendant, stating the fact of being overdrafts, and asking him if they should be paid, to which he replied by directing the payments; that on or about July 9th (the account then showing a balance in favor of Carter), defendant, by reason of ill-health, left the city and was absent some ten days, then returned for a few days, and went away again and remained until about August 1st, but was not at the bank during the few days between the two journeys; that at no time prior to July 30th, did defendant give instructions to the Cashier of the bank not to pay any overcheck; that before absenting himself defendant did not give any directions to the Cashier to pursue any course other than that inaugurated by him, viz., receive deposits and pay checks as they come in.

The other Directors of the bank were not advised that the overdrafts reached any considerable amount. After defendant returned from his trips, one of the Directors, having spoken to defendant of the magnitude of the overdrafts, was

told by defendant that Carter would probably assign bills against boarders; the Director suggested that the debts be garnisheed, but defendant objected, that such course would break up the hotel and injure the men in it. According to the by-laws of plaintiff, the President is, subject to the by-laws and the Directors, the general agent of the corporation; the Cashier is to take charge of the moneys and property of the corporation; and loans are to be made only on the time and conditions prescribed in the by-laws. It is the duty of the Finance Committee to pass upon and allow or refuse all applications for loans. There is no provision in the by-laws for permitting accounts to be overdrawn. It is the puty of the Auditing Committee to supervise the mode in which the business is conducted, to count the cash and examine, or cause to be examined, the books, vouchers, documents, papers, and other assets of the corporation.

It will thus be seen, if there be any fault arising from the facts in this case, such as would entitle the plaintiff to recovery, the duty of protecting the funds of the depositors of the bank, was devolved upon various persons, viz.: It was the duty of the Finance Committee to allow or refuse all applications for loans; of the Auditing Committee to count the cash and examine vouchers and assets; of the Cashier not to permit any loan to be made unless by the order of the Finance Committee; and of the President to govern his own transactions, and see that the transactions of the other officers were governed by the by-laws of the corporation, in the interest of the stockholders and depositors, and in their interest only. The Cashier would not be protected in his omission of duty, by the direction of the President; nor would the non-performance of duty by the Cashier shield the defendant from the legitimate consequences of acts which he took upon himself.

The Court below instructed the jury as follows, the portions excepted to by defendant being by us put in italics, to prevent repetition:

"As business men, you understand that a bank is, or should be, operated for the benefit of its stockholders and those doing business with it. Its operation requires for officers, men who should be possessed of diligence, fitness, and capacity,

as well as honesty, for bank duties; and in the discharge of these duties, *they are bound in law to exercise reasonable skill and ordinary care and diligence.* They are but agents of the corporation, and if they transcend or abuse their powers, they are responsible for any losses resulting from it. Especially is this rule of law applicable to the President of the corporation; for being then the financial officer of the bank, other officers are subordinate to him, and act generally under directions from him. *If he should transcend or abuse his powers—if he should fail in skill, or omit ordinary care and diligence, or be guilty of any wrongful or fraudulent act in discharging his duties, in consequence of which a loss results to the bank, he is responsible in law for it.* Such is the law applicable to the officers of the bank in the discharge of their duties.

"Whether the defendant, as President of the bank, has violated his duty or committed any illegal act, intentionally or unintentionally, in connection with the overdrafts charged against him in this case, is a matter for your consideration upon the evidence.

"You are the exclusive judges of the credibility of witnesses examined, and of the facts proved by their testimony. I may say to you, however, that there is little, if any, conflict of evidence as to the question of the course of dealings between Carter and the bank. Carter was, by the defendant, permitted to overdraw from the bank.

"The defendant himself testifies that it was the custom of the Cashier of the bank to submit to him, as President, overdraft checks as they came in. The first check drawn by him was presented to the Cashier of the bank on the first or second of April, 1875, for the first month's rent of the hotel due to Michael Reese; when presented at the counter of the bank, the Cashier asked the defendant if he should pay it, and says the defendant: 'I said to him, yes, pay it.' Two or three days, or a week afterwards, he adds: 'The Cashier asked me if he should give Carter a pass-book,' and I said, 'Yes, give him one.' At this time, therefore, *the defendant, according to his own testimony, directed the Cashier to pay the overdraft, and induced Carter to open an account with the bank,* and directed the Cashier to give him a pass-book. That being the

position of the parties at that time, *Carter afterwards, during the months of April, May, and June, made overdrafts and occasional deposits from time to time. Now, if you find that this course of dealing between Carter and the bank was inaugurated and established by the defendant, it is a violation of the duty which he owed to the bank, for which he would be responsible in law, if the amount of such overdraft were lost to the bank. That would be the case, gentlemen, whether he were individually interested in the money obtained or not. In either case it would be a misapplication of the funds of the bank;* but these overdrafts were not lost to the bank. The evidence shows that Carter had made deposits from time to time, while he was making overdrafts, up to a time when the account between him and the bank was, as the witnesses say, square. This was early in July. The exact date you will ascertain from the statement of the accounts in evidence; as to the overdraft before that time, it has been correctly said to you by counsel for defendant, that the defendant is not liable, but the question of his responsibility arises from the overdrafts made by Carter after that time. You will recollect, gentlemen, that the defendant testifies that he was taken sick early in July; that he left Oakland for the Springs, I think, about the seventh or eighth of July. The exact date you will determine from the evidence, and that he stayed away until the seventeenth.

"He returned to Oakland, he said, on the evening of the seventeenth. In his absence it appears that the overdrafts of Carter had run up to several thousand dollars, and when he returned, the Cashier and Bookkeeper, and some of the Directors of the bank, Blair, I believe, had interviews with him on the subject of these overdrafts. Now, you will recollect that when the defendant absented himself in July, he left Carter to run the hotel, as he had been doing before. *When he left the bank at that time, he had a duty to perform to the bank. If he authorized an overdraft by Carter for the benefit of the hotel, which had been continued by his authority, sanction, and approval, through the months of April, May, and June, it was his duty when he left for the Springs, to absent himself for some time, to give instructions or orders to the Cashier of the bank as to whether that course of dealing was*

*to be continued or discontinued during his absence. The law did not allow him to remain silent under such circumstances, for all former overdrafts were illegal, and when he was about to absent himself, he should have given such instructions or orders as would indicate that the practice of Carter in making those overdrafts should be stopped, limited, or continued,* and although the Cashier of the bank, in paying such overdrafts by Carter, is not himself excusable in law, yet that fact does not relieve the President, if by his act or conduct loss resulted to the bank from these overdrafts. *If, therefore, you should find from the evidence, gentlemen, or from his conduct in leaving, or from his declaration or declarations after his return, that he knowingly permitted Carter to overdraw and the Cashier to pay these overdrafts, as a means of getting money from the bank to run the business of the hotel in which he and Carter were interested, or otherwise, during his absence, as they had done during the months of April, May, and June, he would in law be liable for any loss resulting from the overdraft;* but, if you find that the Cashier paid them, contrary to and against the express direction of the defendant as President of the bank, you should find for the defendant.

"You observe, therefore, gentlemen, that the issue that is presented to you for your consideration and verdict, is not whether the defendant is responsible for overdrafts, before July, for those, although illegal, were afterwards paid by the drawer, and the bank having suffered no loss in consequence, no liability for that attaches to the defendant.

"The evidence concerning that, is principally important in showing whether an illegal course of dealing between Carter and the bank had been established by the connivance or directions of the defendant, and whether that course of directions continued through the month of July, with his connivance, knowledge, and consent, until the loss in controversy resulted to the bank. *The question is, were the overdrafts, during the month of July, which were lost to the Bank, paid by the Cashier, in the course of the dealing established and inaugurated by the defendant, or were they paid by the Cashier, contrary to, or against the expressed directions of the defendant.*

"At the request of the defendant, and to aid you in the solution of that question, I give you the following instructions:

"Fraud is never to be presumed, and when it is alleged for the purpose of depriving a party of a right, the fact of its existence must be clearly made out. The mere fact that Wilcox was a joint owner in the Grand Central Hotel, and that the money drawn was, if you should so find, used in the improvement of the Grand Central Hotel, is not sufficient in itself for the plaintiff to recover.

"Before you can find a verdict for the plaintiff, you must further find that the checks constituting the overdraft for which this suit was brought, were drawn by Carter with the knowledge and consent of the defendant, and also that they were paid by the Cashier of the plaintiff by the order of the defendant, as President of said corporation.

"Connivance is an agreement or consent, directly or indirectly given, that something unlawful shall be done by another. Before you can find a verdict for the defendant, you must find that Wilcox, directly or indirectly, agreed that Carter should unlawfully draw checks which he, Wilcox, as President of the corporation, would order paid.

"And on the same question I give you the following instruction asked for by the plaintiff:

"If the jury believe from the evidence that the defendant caused C. W. Carter to open an account with the plaintiff by an overdraft, that such overdraft was to the knowledge and with the consent of defendant, followed by other overdrafts, that the overdrafts were of advantage to the business in which the defendant was interested—these are facts tending to prove a connivance and consent of the defendant to the overdrafts made during his temporary absence, and the absolute knowledge of which, at the time they were made, was not brought home to him by the testimony.

"A President of a bank who, knowing a customer to be without means, induces him to open an account at the bank and to overdraw that account by his orders to the Cashier—establishes a custom of paying such overdrafts—fails in his duty to the bank. If he himself profits by that overdraft he commits a fraud upon the bank. It does not excuse him from the charge of connivance and the knowledge and pro-

curation of such overdraft, that the particular checks drawn and paid, in accordance with the custom established and sanctioned by him, were drawn and paid without his actual knowledge. In considering the question of the liability of the defendant, his conduct subsequently, as well as previous, to the overdraft may be considered by the jury. It was the duty of the defendant, as President of plaintiff, to inaugurate and prosecute any suit or action necessary to protect the interest of the bank; and if the jury shall find from the evidence, that after the overdraft sued on had occurred, the defendant used his position and influence, as President of plaintiff, to prevent the plaintiff of availing itself of legal remedies to secure the indebtedness incurred by overdrafts, and if the jury further find, from the evidence, that legal remedies, that were available to the plaintiff, would have been an injury to the defendant, and were opposed by the defendant for that reason, the jury have a right to consider such opposition of the defendant in the light of and as illustrating the previous action of the defendant, in relation to Carter's account at the bank, as the same is detailed by the evidence.

"It is evidence tending to show a connivance with Carter in making the overdrafts. An overdraft on a bank, if made without authority, is a fraud on the part of the drawer; if suggested, countenanced, connived at, and allowed by the President of the bank, without authority of the Directors, it is a fraud on the part of the President. To establish the complicity of the President it is not necessary to prove direct expressed directions from him as to the drawing or payment of each check overdrawn. The jury have a right to take into consideration all the declarations and acts of the President in relation to the subject-matter, and also his business connection with the drawer of the checks; and if you shall believe, from the evidence in this case, that the President, for his own benefit, inaugurated and established a custom of overdrawing by Carter, and did not at any time break up such system, they are authorized to believe that overdrafts made in his temporary absence, and which inured, in whole or in part, to his benefit, were made with his assent, approval, and connivance.

"*It has been said to you, gentlemen, during the argument*

*of the case, that it was a usage at the bank to allow customers to overdraw, and have checks and notes charged up without present funds in the bank.   I believe there is evidence before you showing the existence of such a usage to a certain extent· The fact, however it may be, is for you to find.   But I say to you, as a matter of law, that if such a usage did exist, it would not justify an officer of the bank in case of loss.   The usage is still nothing more than usage and practice to misapply the funds of the bank, and to connive at the withdrawing of the same without any security.   Such a usage and practice is a manifest departure from the duty both of the Directors and President of the bank as can not receive any countenance in a Court of Justice.   It can not be done by the sanction or approval of any officer of the bank, and when done it is at his own peril and responsibility, especially if done in his own interest.*"

Defendant asked the Court to instruct the jury as follows: "Fraud is an intent, 'not criminal,' unlawfully, designedly, and knowingly to appropriate the property of another.   Before you could find a verdict for the plaintiff, therefore, you must find that the agreement between Carter and the defendant in regard to the obtaining of money from the plaintiff (if there was any) was made with the intent, 'not criminal,' upon the part of the defendant to unlawfully, designedly, and knowingly appropriate the property of plaintiff for the improvement of the Grand Central Hotel, of which the defendant was a part owner."   The Court refused to give such instruction, to which refusal the defendant then and there excepted.

The Court gave the following instruction: "*A president of a bank, who, knowing a customer to be without means, induces him to open an account at the bank, and to overdraw that account, and by his orders to the Cashier establishes the custom of paying such overdraft, fails in his duty to the bank.*"

The Court also gave the following instruction: "*An overdraft of a bank, if made without authority, is a fraud on the part of the drawer; if suggested, countenanced, connived at, and allowed by the President of the bank without any authority of the Directors, it is a fraud on the part of the President.*"

As to some of the instructions, indicating that all over-drafts under all circumstances, constitute fraud, the language of the instructions given may be too broad; but, from the facts of this case, we do not think that any injury was done to the defendant, nor that such error was committed as calls for a reversal of the judgment.

We think the law as applicable to this case was, in substance, correctly given by the Court below. We are not prepared to agree with the Judge in instructing the jury that "if he (the President) should fail in skill" he would be responsible; but that expression has no application to this case. There is no question of skill about it. There seems to be no question as to the fact of the overdrafts, nor as to the fact that the money was for the benefit of the hotel. There were, therefore, substantially, but two questions for the jury to consider, viz:

1. Did Wilcox inaugurate the account and its method of being carried on and direct the officers of the bank to pay overdrafts, and were the amounts of overdrafts after July 9th paid in pursuance of and as a part of the method inaugurated by Wilcox?

2. Was he interested in the business of the hotel, and in maintaining it?

These questions answered in the affirmative fix the liability upon him; and to sustain such answers the evidence is ample.

In this case neither the President nor the Cashier had any authority to permit an account to be overdrawn. To make an overdraft was a fraud in law on the part of the drawer; to pay or authorize the payment was a fraud in law on the part of the officer paying or authorizing payment. The money of the stockholders was invested, and of the depositors was deposited, to the end that the business should be managed as the by-laws should prescribe; those by-laws forbid loans to be made without the approbation of the Finance Committee; and when the President or Cashier went beyond that, and loaned upon his or their own judgment, a violation of duty occurred. This is independent of any interest that Wilcox may have had in the hotel business. That interest added to the reason why he should not have caused or permitted the overdrafts. In *F. & M. Bank* v. *Downey,* 53 Cal. 466, the Court

held that an officer of a bank could not make profit to himself out of loans made by him of the money of the bank; and it very naturally follows, if losses occur in the attempt he must bear the losses. "The Directors are the trustees or managing partners, and the stockholders are the *cestuis que trust,* and have a joint interest in all the property and effects of the corporation, and no injury that the stockholders may sustain by a fraudulent breach of trust can, upon the general principles of a court of equity, be suffered to pass without a remedy." (*Koehler* v. *Black R. F. I. Co.,* 2 Black, U. S., 715, 721.) As is said in Morse on Banking, p. 317, speaking of the custom of permitting overdrafts and kindred practices, "The language of the adjudicated cases is not capable of being explained away."

"In the case of a saving fund incorporated for the purpose of receiving the money of persons of humble fortune, and keeping it safely against the day of old age, want, or illness, there is, in the nature of things and of common right, a trust coupled with the obligation, a duty not only merely to pay on demand, but to keep safely, and invest wisely, in order that there may be the means of payment. * * * Every departure from the proper course in this respect on the part of the directors or managers of a saving fund is a breach of trust, of which equity will take cognizance, and hold them individually and personally liable." (*Leffman* v. *Flanigan,* 5 Phil. 155.) "Where the President of a bank makes loans of the bank funds to irresponsible persons without security, having a private interest of his own to advance thereby, the bank may charge him personally with the loans and recover the amount in a suit at law." (Cooley on Torts, p. 522; *Shea* v. *Mabry,* 1 Lea, (Tenn.) 319.)

"When agents and others acting in a fiduciary capacity, *understand that these rules will be rigidly enforced,* even without proof of actual fraud, the honest will keep clear of all dealings falling within their prohibition, and those dishonestly inclined will conclude that it is useless to exercise their wits in contrivances to evade it." (*Bain* v. *Brown,* 56 N. Y. 288.)

We refer to the following cases as sustaining the views above expressed. (*Minor* v. *Mech. Bank,* 1 Pet. 72; *Eichel-*

*berger* v. *Finley,* 7 Har. & J. 387; *Bank of St. Mary's* v. *Calder,* 3 Strobh. 408; *Lancaster Bank* v. *Woodward,* 18. Pa. St. 362; *Robinson* v. *Smith,* 3 Paige, 231; *Shear* v. *K. & K. R. R. Co.,* 6 Bax. (Tenn.), 278.)

There is no error in refusing the instructions asked for and refused.

Judgment and order affirmed.

MORRISON, C. J., and McKEE and THORNTON, JJ., concurred.