# CHARLESTON

LOWANCE v. JOHNSON.

Submitted February 5, 1915. Decided March 16, 1915.

1. PRINCIPAL AND AGENT—*Inference of Agency—Ratification of Similar Acts.*

Agency to do a particular act may be inferred from the adoption and ratification, by the principal, of acts of like kind performed for him by the agent. (p. 789).

2. SAME—*Torts of Agent—Liability of Principal.*

If a person, assuming to be agent of another, performs for him an act, which he afterwards ratifies by receiving the benefits derived from it, the principal thereby becomes liable for the torts committed by the agent, within the scope of his assumed authority, in performing the act. The principal can not accept the benefits, without also bearing the burdens, of the agent's acts. (p. 789).

3. FRAUD—*Action by Buyer—Evidence of Similar Misrepresentations.*

In an action for fraudulent representations respecting the value of bank stock, made by the owner thereof to plaintiff or his agent, to induce him to buy, evidence of similar representations, made to others near the same time, is admissible as tending to establish a general purpose to deceive. (p. 790).

4. PRINCIPAL AND AGENT—*Liability of Principal—Deceit Accomplished Through Agent.*

Liability for a deceit exists whether accomplished by the deceiver in person or by agent, and whether communicated to the injured party directly or through his agent. (p. 791).

5. FRAUD—*False Representation—Liability.*

If a person makes false representations with intent that they be communicated to another, and they are so communicated, believed and acted on to the injury of such other, the person making them is liable. (p. 792).

(LYNCH, JUDGE, absent.)

Error to Circuit Court, Monroe County.

Action by W. F. Lowance against A. E. Johnson. Verdict for plaintiff set aside, new trial awarded, and plaintiff brings error.

*Reversed, and judgment entered for plaintiff.*

R. Kemp Morton, for plaintiff in error.

R. F. Dunlap, J. W. Arbuckle, and Jno. L. Rowan, for defendant in error.

WILLIAMS, JUDGE:

By this writ of error plaintiff seeks reversal of an order of the circuit court of Monroe county, made on the 13th of November, 1912, setting aside a verdict found for him and awarding a new trial, in an action of trespass on the case, for alleged false and fraudulent representations made by defendant to him, respecting the financial condition of the Bank of Union, and the value of its capital stock, whereby he was deceived and induced to purchase from said defendant three shares of said stock, of the par value of $100, but then worthless, at the price of $90 per share.

Plaintiff's counsel insist that there is sufficient evidence to support the verdict, and that no error was committed during the trial, respecting the admission or exclusion of evidence, or in giving or refusing instructions, which would justify setting aside the verdict. It is, therefore, necessary to review both the evidence and the rulings of the court.

The bank was insolvent at the time plaintiff purchased, and had been so for some time previous thereto, but its real

condition was concealed by its directors. Some of them may have been, and doubtless were, ignorant of its true condition. A former cashier had taken his own life, and it was generally supposed he did so because of the bad condition of the bank's affairs. This occurred on April 10, 1905. In May following, W. G. Caperton, a stockholder and director, offered to sell 149 shares of his stock to defendant at $25 per share. Defendant did not then buy, but, about two weeks later, purchased the same shares, at $10 a share. Before purchasing the stock, defendant examined the books and assets of the bank, assisted by J. D. Logan, its president. Defendant says his investigation was not thorough, because he was not familiar with the financial ability of some of the makers and indorsers of notes held by the bank. Defendant says he purchased the stock about the last of May, 1905. He became a director on the 31st of May, and was again elected on June 16, 1905. The bank was then reorganized. The bank was carrying on its books bills and notes, as live assets, that were many years overdue, and large overdrafts likewise of long standing. These claims were mostly against its officers. Although the bank was then insolvent, sworn financial statements were published on the 7th of June, and the 8th of September, 1905, showing it to have a surplus fund of $12,000. In order to meet the bank's obligations, the old directors had borrowed from other banks about $18,000, for which they had given their joint individual note, and, in addition to paying $10 a share, defendant assumed W. G. Caperton's personal liability for that loan, which was about the one-sixth thereof, the other directors who were jointly liable with him being solvent. These loans were later paid in full by the bank itself. Almost immediately after he had purchased the 149 shares of stock, defendant began selling it to various persons, in order to interest them, as he says, and thus restore the confidence of the public in the solvency and stability of the bank.

Plaintiff did not purchase the three shares of stock from defendant directly, and admits there was no direct communication between them respecting the transaction. His attention was called to the fact that defendant was offering stock for sale by S. S. Steele, who had previously bought some from him at $75 per share. Steele told plaintiff that he had paid

for his stock, and that defendant had raised his price to $90 a share, saying it was worth more than when he (Steele) had bought. This conversation between Steele and plaintiff was about a month after Steele's purchase, and occurred, casually, at plaintiff's house at Peterstown, several miles from Union, where Steele had gone on a social visit, and not for the purpose of selling bank stock. Steele does not claim that he was at that time defendant's agent, but says plaintiff simply asked him if he knew where he could safely invest some money, and, knowing defendant had bank stock for sale, he mentioned it to plaintiff, and he replied that he had heard the bank was not in good condition and did not want the stock. A few days after that Steele was again at plaintiff's house, having gone, this time, to meet his daughters who were returning home from teaching school, and had stopped in Peterstown to visit plaintiff's wife, their old schoolmate and friend, and the question of the bank stock, as an investment, again came up, causally, and plaintiff authorized Steele to purchase three shares for him. The exact date of this conversation is not shown, but it was about a month after Steele had purchased some stock of defendant. After returning to Union, Steele wrote plaintiff that he had secured the stock for him and plaintiff sent his check for $270, drawn on another bank payable to Steele's order, and dated July 13, 1905. The check is indorsed first by S. S. Steele and then by John Osborne. The name of A. E. Johnson, the defendant, does not appear on it. Defendant denies that he was the owner of the stock sold, and denies that either Steele or Osborne was his authorized agent to sell his stock. Plaintiff admits that he got all the information he had respecting the value of the stock, through Steele, and says Steele told him it was claimed by those who had charge of the bank that the stock would pay six per cent. or more, and he relied upon the truth of that representation and was thereby induced to buy. Defendant and Osborne both swear the latter was the owner of the stock sold to plaintiff. But counsel contend in brief, that Osborne's claim of ownership was only a pretense and subterfuge to conceal defendant's real interest in the transaction; and there is evidence in the record which would justify the jury in reaching such a conclusion. They could

well believe that Osborne was defendant's attorney and general agent to sell his stock, and that defendant was anxious to dispose of all the stock he had. He was defendant's legal adviser, and spent the night with him just previous to defendant's purchase of the 149 shares from W. G. Caperton, and rode with defendant in his buggy, on the next day, to the home of Cary Nickell, one of the directors, where they met J. D. Logan, president of the bank, and closed the deal with him as Caperton's agent, at $10 a share for the 149 shares of stock. Osborne admits he prepared the contract whereby defendant assumed Caperton's liability on the directors' notes securing certain loans made to the bank, and says defendant signed it and then delivered to him his check, payable to Caperton, for the stock and he carried the check to Caperton. He further says he thought the stock was a good bargain at $10 per share, and he applied to Logan to let him have 20 of the 149 shares, and that he replied he had no objection if defendant would consent, and that defendant did consent and advanced the money for him. But he admits defendant retained the stock to secure himself. Defendant says Osborne had no right to sell any of it unless and until authorized by him. There is no evidence that Osborne paid for any of the stock, otherwise than by turning the proceeds of sales of it, when made by him, over to defendant. Plaintiff's check, being payable to Steele, was indorsed by him and left with the bank, and Osborne then indorsed it, had the funds placed to his own credit and immediately checked it out to defendant. Shortly before this sale to plaintiff, Osborne had sold some of defendant's stock, at $90 per share, to James Campbell, under a written guaranty by defendant that it would pay a dividend of six per cent., giving Campbell a year in which to rescind the sale, if it did not pay such dividend. But he says he did this without previous authority, and the defendant ratified the sale and signed the guaranty contract. He further says he interested several parties in the bank, for the "purpose of enhancing the value of the stock," but that he got no compensation for doing it. Quoting his language, he says: "I stated that he (defendant) advanced the money. He knew my circumstances. And I felt under obligation to help him all I could." Help him in what way? we ask, unless in the

manner shown by the record by boosting this worthless bank stock and disposing of it for his client and principal, to unsuspecting purchasers, ignorant of its value, at an enormous profit.  Osborne made other sales and trades of stock for defendant that were afterwards ratified by him.  He says: "I never acted as his agent to sell the stock, although I knew he would ratify any contract I made, because I wouldn't make any that I didn't know would be acceptable.  I made two tracts (trades).  I traded some bank stock to Mr. Liveless for some cold storage stock, which was practically trading the devil for a witch."  It does not appear that defendant ever failed or refused to ratify a single sale or trade made by him.  Although there is no direct evidence of Osborne's express authority to sell the particular stock in question, may not a general agency to sell all the stock defendant owned be inferred from these facts and circumstances showing their course of dealings?  We think so.  It was so held in *Downer & Co.* v. *Morrison,* 2 Grat. 237.  Their course of dealing between them was consistent only with the theory of agency.  On what other theory could Osborne be justified in saying he knew defendant would ratify any sale or trade of stock he might make?  The law is thus stated in 31 Cyc. 1221: "The subsequent adoption and ratification by the principal of similar acts done by the agent may justify the inference that the agent has authority to do acts of that kind."  Numerous decisions are cited in support of the text.  The same principle is also stated in 1 A. & E. E. L. 96.

Again, if it be assumed that Osborne sold the stock without authority, but representing himself to be defendant's agent, and defendant afterwards ratified the sale, he is likewise liable for any fraudulent representations Osborne may have made to induce plaintiff to buy.  A principal can not ratify the act of an unauthorized agent, and accept the resulting benefits, without also becoming responsible for the burdens.  He adopts the unauthorized act, *cum onere.*  By ratifying the act he waives the agent's want of authority, assumes the transaction as it was done by the agent, and "becomes bound by all the instrumentalities used by the agent, within the scope of the assumed authority, including his frauds, misrepresentations, and other torts."  31 Cyc.

1289; 1 Clark & Skyles on Agency, 272; *Lane* v. *Black*, 21 W. Va. 617; *Nims* v. *Mt. Hermon Boys' School*, 160 Mass. 177, 39 Am. St. Rep. 467; *Morehouse* v. *Northrop*. 33 Conn. 380, 89 Am. Dec. 211; *Gulf &c. Ry. Co.* v. *Reed*, 80 Tex. 362, 26 Am. St. Rep. 749; *Clark* v. *Ralls*, (Iowa), 24 N. W. 567; and *Wilder* v. *Beede*, 119 Cal. 646.

Defendant's ratification is shown by receiving the fruits of the sale with knowledge thereof. Osborne immediately turned the money over to him. There being evidence to support the claim of agency, either by inference from the course of dealings, or by subsequent ratification, it therefore follows, that any statements made by Osborne, for the purpose of inducing plaintiff to purchase the stock, is admissible in evidence against defendant. Steele says he bought his stock, through Osborne, from defendant, about a month before the sale to plaintiff and that all information he had concerning the bank's condition he got from them, that defendant told him at the time he bought that the stock was worth from ninety to ninety-three cents on the dollar, and if a certain debt, known as the Englishman's debt, could be collected, it would pay more, but that, regardless of that debt, it was worth ninety dollars a share and would pay a dividend at that price; that he communicated these representations to plaintiff because he believed them to be true, and thought the stock, at that price, was a good investment; that Osborne first told him to sell three shares to plaintiff, at the same price and on the same terms of the previous sale defendant had made to Campbell, which was at $90 a share, with the guaranty that it would pay six per cent. dividend; and that a little later, and before he notified plaintiff he could get the stock, defendant Osborne and he met at the bank, and defendant, in his presence, approved and ratified what Osborne had authorized him to do. Steele, although a director of the bank and a member of the executive committee, says he did not know the bank's real condition, never having listed and examined its assets, his duties as member of the executive committee not necessitating his doing that, but only requiring him to pass upon loans and renewals of notes. He may have been negligent not to know the bank was insolvent, but his negligence is no excuse for defendant's misrepresentations as to the value of the stock.

He says he relied on what Osborne and defendant had told him as being true, and he had a right to do so. Their statements were certainly made to be accepted as true. Witness O. L. Miller testified that he bought some stock from defendant in April, 1906, and that defendant told him, that he and Mr. Dwyer had examined the books of the bank and ascertained that the stock was worth seventy-five cents on the dollar, and that, if certain debts the bank held were collected, it was worth more, but that, without the collection of those debts, it was worth at least seventy-five cents on the dollar. C. B. Hunter, another witness for plaintiff, testified that, on June 15th or 16th, 1905, he bought five shares of stock from defendant and paid him $100 a share for it, and that defendant represented to him that it was worth 'dollar for dollar.

This testimony was admissible to show intent to deceive. Evidence of similar acts and statements done and said, near the same time, concerning the value of the bank stock, for the purpose of inducing others to buy, is admissible to prove a general scheme or plan by which defendant would be enabled to deceive the public into buying it. *First Nat. Bank of Pennsboro* v. *Parker et al.,* 75 W. Va. 244, 83 S. E. 898; *Wilson* v. *Carpenter's Adm'r.,* 91 Va. 183, 21 S. E. 243; 1 Wigmore on Evidence, sec. 304. "Where fraud in the sale and purchase of property is in issue, evidence of other frauds of like character, committed by the same party, at or about the same time, is admissible. Large latitude is always given to the admission of evidence where the charge is fraud." *Piedmont Bank et als.* v. *Hatcher et als.,* 94 Va. 229.

It is contended that Steele acted as agent of plaintiff in buying, and not as agent of defendant in selling, the stock. Whether he acted as the agent of the one or the other, makes no difference as to the liability of defendant, the rule of law being, that where false representations are made to an agent, for the purpose of inducing him to act upon them in behalf of his principal, the latter has a right of action for the fraud. 20 Cyc. 81; *Clifford* v. *Gadd,* 17 N. Y. Sup. 457, affirmed in 139 N. Y. 618; *Raymond* v. *Howland,* 7 Wend. 176. "Where plaintiffs are induced to take stock in the corporation in reliance on the false representations of the president, made to another, with intent that they shall be communicated to

plaintiffs to induce them to take stock, or where their agent, in reliance on such representations, purchases stock for them, the president is liable to them directly.'' *Hubbard* v. *Weare,* 79 Iowa 678, 44 N. W. 915. This case is very similar to the one at bar, and is directly in point.

The jury had a right to believe, from all the circumstances relating to defendant's purchase, the price he paid for the stock, the numerous declarations respecting its value and how much dividend it would earn, proven to have been made by him, after his purchase, examination of the bank's assets, and from his effort to induce Campbell to retain and pay for the stock which he had conditionally bought, by sending him his own check to make good his guaranty that the stock would earn six per cent. dividend, at $90 a share, a circumstance defendant does not deny, that he was endeavoring to create public confidence in the solvency of the bank, in order that he might be able to sell his stock at a great profit. The rule of law in such case is, that, although the representations, intended to deceive the public, were not made directly to the party deceived or his agent, but to another who communicated them to him and thereby mislead him to his injury, the person making such false representations is liable. 20 Cyc. 81. This is a familiar principle, and many decisions are cited in support of the text in a foot note thereto. The question has frequently arisen in suits against corporations and their promoters for false representations published, as to the value of stock or of the amount of the corporation's assets. The testimony of defendant and Mr. Osborne conflicts directly with that of Mr. Steele, but the jury were the triers of fact and the only tribunal to pass upon the value of conflicting testimony of witnesses. The verdict could not properly have been set aside for want of sufficient evidence to sustain it.

It is urged that plaintiff's instruction No. 3 was improperly given, and that defendant's No. 6 was erroneously refused. Objection to plaintiff's instruction is, that it assumes that Steele was the agent of plaintiff. That was an assumption warranted by evidence proving the fact, which is not denied. Plaintiff and Steele both testify that plaintiff authorized Steele to buy three shares of stock for plaintiff, and no other witness denies it. Defendant's instruction, refused,

does not state the law correctly, as applied to the facts of the case. The jury might believe all the facts submitted to them by the instruction, and still defendant would be liable for other reasons, yet the instruction binds them to find for defendant if they believe those particular facts.

We find no error for which the court should have set aside the verdict, and will, therefore, reverse the order of the court, reinstate the verdict and enter judgment thereon.

*Reversed, and judgment entered here.* .