# CHARLESTON.

CITIZENS NATIONAL BANK OF PARKERSBURG V. BLIZZARD *et al.*

Submitted April 24, 1917.   Decided May 15, 1917.

1.  BANKS AND BANKING—*Payment of Checks—Liability of President.*

    The president of a bank, in general charge and practical control of its business, having the cashier under his authority, who directs payment of the checks of a corporation which has no money on deposit in the bank, in which he is interested and to which he has obligated himself to lend his credit by endorsement or otherwise to enable it to pay certain debts, knowing that its indebtedness is equal to the full value of its property and franchise, is personally liable to the bank for the money thus paid out.   (p. 516).

2.  SAME—*Acts of President—Ratification—Knowledge.*

    If, under the direction of the president, no record is made of such overdraft on the bank's books, but the checks of such corporation are simply carried as cash, and after parting with his interest in the corporation, the president causes the bank to discount its note and applies the proceeds to the discharge of the overdraft, without the knowledge by the directors of the purpose for which the note was discounted, he thereby conceals the real nature of the transaction, which prevents the subsequent approval by the directors of his act in discounting such note from becoming an implied ratification of his wrongful application of the bank's funds in paying the worthless checks. Knowledge of an act is essential to its ratification.   (p. 516).

3.  SAME—*Partnership—Torts—Joint Liability—Bank Director.*

    On the principal of mutual agency between partners, all are liable to third persons for the tort of a co-partner, committed in due course, and in the interest of the partnership. Hence, a director of a bank, who is jointly interested with its president in a corporation to which he directs the bank's funds to be paid without security, is jointly liable with him, as well as severally, for the bank's loss.   (p. 517).

4.  SAME—*Knowledge of Officer—Imputation to Bank.*

    Knowledge by a director of a matter affecting his bank, which his personal interest would prompt him to conceal, can not be imputed to the bank.    (p. 517).

5.  EQUITY—*Laches—Imputation.*

    Laches in asserting a right is not to be imputed, if the wrong is concealed, and the party affected has no means of discovering it. (p. 520).

6.  BANKS AND BANKING—*Officer's Liability—Discharge.*

    An officer's liability to his bank for a misappropriation of its funds, which is unknown to, and purposely concealed from it, is not discharged by his inducing a third person to execute his note to the bank and applying the proceeds thereof to replace such funds, the note itself not being paid.    (520).

    (MILLER, JUDGE, concurring).

Appeal from Circuit Court, Wood County.

Suit by the Citizens' National Bank of Parkersburg against Reese Blizzard and P. D. Neal, as executor, etc.   Decree for plaintiff, and defendants appeal.

*Affirmed.*

*Reese Blizzard* and *C. D. Merrick,* for appellants.

*J. W. Vandervort* and *F. P. Moats,* for appellee.

WILLIAMS, JUDGE:

The object of this suit is to recover of the defendants· funds belonging to the plaintiff bank, alleged to have been wrongfully misappropriated by C. H. Shattuck, now deceased, and Reese Blizzard when they were directors thereof.   C. H. Shattuck died in the year 1911, testate, and the defendant P. D. Neal ·qualified as his executor.   At the time of and for many years prior to his death, Shattuck was president of the bank.   Shattuck and Blizzard also owned and controlled the stock of the Parkersburg Publishing Company, a corporation, publishing a ·daily newspaper in the city of Parkersburg· called the *West Virginia Dispatch-News,* and Robert and Ben W. Morris owned and controlled the stock of the State Journal Company, another corporation, publishing a daily and weekly newspaper called the *State Journal.*   On the 20th of

November, 1909, the Morrises and Shattuck and Blizzard entered into a written agreement to consolidate the two plants, according to the following plan: The Parkersburg Publishing Company was to be the name of the new corporation, which was capitalized at $46,000, $20,000 of which stock was to be turned over to the Morrises in payment of the property, rights, franchise and good will of the State Journal Company, and the remaining $26,000 was to be held and owned by said Shattuck and Blizzard. Each corporation was to be then free from debt or obligation of any character. In the agreement the Morrises are described as parties of the first part, and Shattuck and Blizzard as parties of the second part. Such parts of said agreement as are material to the present inquiry are as follows:

"It is agreed and represented by the parties of the first part that the indebtedness of the State Journal Company shall not exceed the sum of Twenty-Thousand Dollars ($20,000.00), and that the parties of the first part are to execute their four (4) negotiable, promissory notes to themselves, and endorse the same, and attach thereto as collateral security, in equal amounts, the Twenty-Thousand Dollars ($20,000.00) of stock of the Parkersburg Publishing Company to be issued to them.

"And the parties of the second part hereby agree that on proper renewals of the said notes, with collateral attached, they will, by endorsement or otherwise, have the said notes carried for the parties of the first part for the period of four (4) years from this date, and should the parties of the first part pay off any of the said notes, they are entitled to take down or withdraw said collateral so attached to said note.

"A sufficient amount of the proceeds of the said notes shall be used to pay off and discharge all of the debts of the State Journal Company, and to procure a release of any and all liens that may exist against the property, good will and franchises thereof.

"The parties of the second part further agree that should the parties of the first part desire to sell the total amount of their said stock within two (2) years from this date, at the par or face value thereof, then the parties of the second part

agree to secure purchasers for the said stock at the par or face value thereof, or if unable to do so within thirty (30) days agree to become the purchasers thereof themselves at the par value thereof. And in all events, if the parties of the first part sell said stock, or any part thereof, the parties of the second part are to have the preference of purchasing the same at whatever price sold; and should the parties of the second part sell or offer for sale any or all of the said stock so owned by them, the parties of the first part are to have the preference in purchasing the same at whatever price sold.''

It was stipulated that the consolidation was to become effective as of the 22nd day of November, 1909. The four negotiable promissory notes were never executed by the Morrises, nor was any certificate for the capital stock of $20,000 in the new company ever turned over to them. The parties became dissatisfied and it was mutually agreed to rescind the agreement, and this they did in writing, signed by all of them, on the 16th of May, 1910. But while the contract was in force the State-Journal Company drew numerous checks upon the plaintiff bank, in payment of its floating indebtedness when it had no funds therein to its credit, and at the direction of C. H. Shattuck, who was the bank's president and practically managed it, the cashier paid these checks and made no entry thereof on the bank's books, and carried the checks simply as cash. At the time the contract was rescinded these checks or overdraft amounted to $5,000, or more. The rescission agreement provided that the Morrises should protect Shattuck and Blizzard from liability on account of the original contract. At the same time, the State Journal Company executed its note to the bank for the sum of $5,100 to take the place of another note for $5,000 which said Shattuck had procured to be made by Ben W. Morris and endorsed to the bank by Leland Morris, on the 22nd of the preceding January. The last mentioned note was discounted and the proceeds applied to discharge the overdraft. This note was taken for a temporary purpose, was payable in thirty days and was not paid or renewed when it became due, but was carried in the overdue file until May 16th when the note of

the State Journal Company for $5,100 was taken in its stead. Concerning this note the rescission agreement contains the following provisions: ''But it is expressly understood that so far as this contract is concerned, and so far as the parties of the second part (Shattuck and Blizzard) are concerned, the parties of the first part (the Morrises) do not assume personal liability to the Citizens National Bank for a note of $5,-100.00 executed to it by the State Journal Company as of this date.''

Mr. Flaherty, who was cashier of the bank at the time these transactions took place, states positively that the attention of the directors was never, at any time, called to them, and that he paid the checks of the State Journal Company under the express direction of Mr. Shattuck who practically controlled the bank; that he did nothing in connection with the bank's business without his direction. He swears that, at the time the Ben and Leland Morris note was taken, Mr. Shattuck, who was then ill, called him to come to his house and bring the checks representing the overdrafts, and he did so, and turned the checks over to Mr. Shattuck in the presence of the defendant Reese Blizzard; that the existence of the checks, or the manner in which they were disposed of, was never called to the attention of the board of directors; that he attended the directors' meetings and acted as their secretary and no note or minute was ever made of this matter. There is no proof of what Shattuck did with the checks. It is proven that neither Ben nor Leland Morris had any property and consequently their note was of no value. The note of the State Journal Company was later secured by a second deed of trust upon its property and franchise, a prior one, covering the same property, having been executed by it to secure $15,000 of debts owing to a number of banks in the city of Parkersburg, one of which was the plaintiff bank. These secured debts and the floating debts which were paid by plaintiff bank on the worthless checks of the State Journal Company made up the $20,000, to pay which Shattuck and Blizzard had agreed to lend their credit to the Morrises, by endorsing their notes ''or otherwise.'' The State Journal Company's property was sold under the deeds of trust, and the

proceeds were not sufficient to satisfy the liens, and left the whole of the $5,100 note unpaid.

There is no material conflict in the evidence, establishing the foregoing state of facts.

The cause was heard on pleadings and full proof and on the 7th of December, 1916, a decree rendered holding the defendant Reese Blizzard and the estate of C. H. Shattuck, deceased, liable to the bank, and decreeing a recovery against said Blizzard and P. D. Neal as executor of C. H. Shattuck, deceased, for $7,060, and they have appealed.

It is insisted, on the part of Mr. Shattuck's executor, that his testator acted in good faith in honoring the checks of the State Journal Company, and therefore his estate is not liable; that the board of directors assented to the taking of its note for $5,100, and the bank is estopped by their action. On the part of defendant Blizzard, it is contended he did not participate in allowing the overdraft, knew nothing of it at the time, and is consequently not liable. And as a defense equally applicable to both, the doctrine of laches is invoked. They both occupied a confidential relation to the bank as its officers and agents, and in their dealings affecting its interest were required to act in perfect good faith. Mr. Shattuck could not, without violating his duty, use his official connection with the bank to its detriment, in order to further undertakings of his own in which the bank had no interest. This principle is too fundamental to require support by citation of authorities. The proof is, the checks of the State Journal Company were paid out of the bank's fund, when it had no money therein to its credit, upon Shattuck's express direction to the cashier. In view of the contract then in force between the Morrises and Shattuck and Blizzard, these checks were not paid in the sense of a loan, as is sometimes done in the regular course of banking for the accommodation of a good customer of the bank. Mr. Shattuck then knew the State Journal Company was indebted to the extent of the value of all its property, the Parkersburg Publishing Company, owned by Shattuck and Blizzard, had consolidated with it and taken its property at the price of $20,000, the amount of its debts. He also knew its property was covered by a deed

of trust for $15,000, because $5,400 of it was a debt owing to his own bank. There can be no doubt that Mr. Shattuck directed the cashier to pay the checks for his and Mr. Blizzard's benefit, as well as for the accommodation of the State Journal Company, in pursuance of their previous agreement to aid the Morrises to obtain money with which to pay the State Journal Company's debts by endorsing their notes, "or otherwise". There is no proof that any of the directors, except Shattuck and Blizzard, ever knew of this overdraft, or that the checks were carried as cash. No minute was made of it or entry on the books of the bank whereby they could have obtained any information concerning it. Why did Mr. Shattuck request the cashier to bring the checks to his house, or office, and turn them over to him, if it was not to conceal the fact of their existence and that an overdraft had been allowed? We can imagine no other motive for the act. We do not think he conceived a purpose to defraud the bank at the time the checks were paid. At that time he had no apparent reason to suspect the consolidation arrangement would not be carried out as agreed, in which event he would have been fully indemnified against the overdraft. In view of Mr. Shattuck's knowledge of the embarrassed condition of the State Journal Company, and his and Mr. Blizzard's contract to take over its property, it would be unreasonable to say he was acting solely for the bank, and in good faith, in permitting it to make so large an overdraft.

While it does not appear that Mr. Blizzard actually participated in allowing the overdraft, yet it is apparent that it was for the joint benefit of Mr. Shattuck and himself. They were jointly interested in acquiring the property of the State Journal Company, and were equally obligated to endorse the notes of the Morrises, or otherwise assist them in procuring the money with which to pay that company's debts. Can he avoid liability on the ground of ignorance of, and failure to participate in the commission of the wrong? We hardly think so. He and Shattuck were partners, consequently each was the agent of the other within the scope of the partnership. The checks were paid in furtherance of their joint contract, and their payment was intended for their joint benefit. The

failure of the consolidation scheme and the fact that because thereof, neither Shattuck or Blizzard received any actual benefit from the payment of the checks, can not affect the principle of their liability. *Oakland Bank of Savings* v. *Wilcox,* 60 Cal. 126. They were ordered paid in the hope that benefit would be derived thereby. Their liability is founded upon the purpose of the wrongful act, rather than upon the benefit actually derived from it. On the principle of agency, each partner is liable to third persons for the torts of his co-partner committed within the ordinary course of the firm business. 1 Rowley Modern Law of Partnership, Sec. 503; and 30 Cyc. 523. The wrong is more in the concealment of the overdraft than in permitting it to be made in the first place. If the contract with the Morrises had not miscarried, we have no doubt the overdraft would have been taken care of by Shattuck and Blizzard. Blizzard knew of Shattuck's wrongful act in January, five months before the contract with the Morrises was rescinded. He was present when the checks evidencing the overdraft were turned over to Shattuck by the cashier, and then learned, if he did not know before, why they had been paid, and did not repudiate the wrongful act of his partner. Presumptively, his failure to repudiate the act amounts to a ratification of it. 30 Cyc. 529; 1 Rowley Modern Law of Partnership, Sec. 472; and *Lowance* v. *Johnson,* 75 W. Va. 784.

The bank has done nothing to release defendants from liability, nor to estop itself from asserting it. Discounting the Ben and Leland Morris note did not have that effect, for that was done by Mr. Shattuck himself and without the knowledge of other directors. The testimony of the cashier proves that note was taken to satisfy the bank examiner who complained of the checks being carried as cash. It was a thirty days' note, and was not paid or renewed when it became due, but placed in the overdue file and carried until the note of the State Journal Company for $5,100 was executed. Mr. Blizzard says he was not consulted in regard to the payment of the checks and knew nothing more in regard to them than he did of other matters pertaining to the bank which, he says, was conducted almost exclusively by Mr. Shattuck. But he

admits Mr. Shattuck called him to his office and told him about the overdraft, and that he was present when Mr. Flaherty, the cashier, delivered the checks to him. The only difference between the testimony of Mr. Blizzard and Mr. Flaherty on this point is as to where the meeting occurred, the former placing it as Shattuck's office and the latter at his home. The discrepancy is immaterial. Mr. Blizzard also states that, sometime after that meeting, Mr. Shattuck casually informed him he had taken the note of Ben W. and Leland Morris, temporarily, for the overdraft. He further states he was present at a meeting when Mr. Shattuck explained to the board of directors that the State Journal Company's note was taken in lieu of the Ben W. and Leland Morris note, because he had had the records of the county court clerk's office examined, and ascertained they were assessed with no property. But there is no evidence in the record to explain why the first note was taken, nothing proving the directors knew it was to supply an overdraft, and nothing to show they knew it had been taken at all, until after the second note had been taken. Hence there is no proof of knowledge by the directors of Mr. Shattuck's wrongful act on which to predicate either a ratification of it, or a waiver of the bank's right to hold him liable for it.

After the overdraft had been made, a conference was held between the Morrises and Shattuck and Blizzard at which the manner in which the business of the consolidated company was being carried on was discussed. Considerable dissatisfaction was expressed and a violent controvery arose between Ben Morris and Mr. Blizzard. It then developed that the consolidation scheme was not going to be a success. But notwithstanding, Mr. Blizzard says he told Mr. Shattuck he was unwilling to let go of the contract, and Mr. Shattuck replied in substance: "Leave it to me, we are going to take a deed of trust on it in addition to what we already have, and the Morrises will not make money out of it like you would (indicating me) and the paper will finally be for sale and we can buy it in, I called his attention to the fact that it would run over years under an arrangement of that kind and he said no, that the other banks had been wanting him to join with

them in foreclosing the paper for what had been secured under the other deed of trust. Under these circumstances there was nothing for me to do but to acquiesce in the arrangement that he had made.'' Mr. Blizzard further says it was his and Mr. Shattuck's intention, even as late as May 16, 1910, when the contract was rescinded, ''to purchase the State Journal and consolidate the State Journal and the Dispatch-News,'' and that such intention continued for sometime thereafter, until, on account of bad health, they both abandoned the newspaper business.

What was Mr. Blizzard's duty, as an officer of the bank, when, as he says, he was informed for the first time by Mr. Shattuck of the overdraft? There is but one correct answer to this question. He should have notified the directors of it, and thus given them an opportunity to approve or disapprove Mr. Shattuck's act. It was a matter of vital importance to the bank, and his silence is tantamount to an approval of Mr. Shattuck's action. That Mr. Shattuck was a man of reputed integrity, financial ability and practically controlled the bank, could not relieve Mr. Blizzard from the discharge of his official duty to it. He could not help knowing why the overdraft had been allowed, but chose not to inform the other directors. He was jointly interested with Shattuck, and their personal interest in the transaction prevented their knowledge of it from becoming notice to the bank. *Bank* v. *Bryan,* 72 W. Va. 29; *American Bank of Bluefield* v. *Ritz,* 70 W. Va. 409; *Bank* v. *Lowther-Kaufman Oil & Coal Co.,* 66 W. Va. 505; and *Rusmissell* v. *White Oak Stave Co. et als.,* decided at the present term.

The liability having once attached, could not be discharged by the substitution of notes of third persons by the wrongdoer, without the bank's knowledge and consent to such arrangement. There is no proof that any of the directors, except Shattuck and Blizzard, were ever advised of the purpose for which the note of Ben and Leland Morris had been taken, after they learned the bank held it. Mr. Blizzard said it was taken for temporary purposes, but there is no proof that the bank ever knew it existed until after the note for $5,100 of the State Journal Company was taken, and while it may be

true the directors learned that the last note was taken in place of the first one, and may, therefore, have acquiesced in the substitution of one note for the other, still there is no evidence whatever that the directors assented to the substitution of either note for the bank's right of action against defendants for the overdraft. The books of the bank show the note of the Morrises was a mere loan. It appears to have been discounted in regular course, and the proceeds, credited to the cash. But the proceeds were applied to the overdraft, which did not appear on the bank's books, and of which no one knew, so far as the record discloses, except the cashier and Shattuck and Blizzard.

The equitable doctrine of laches does not apply. The real nature of the transaction was hidden by the manner in which the cashier kept the books. The proof shows he acted, in respect to the matter, under the direction of Mr. Shattuck. Hence the bank's books disclosed nothing which could have the effect of notice to the directors, nothing to arouse suspicion of any irregularity. The bank had no information concerning the overdraft until a short time before the bringing of this suit. The present president of the bank, G. L. Watson, says he accidentally heard a rumor, to the effect that the $5,100 note of the State Journal Company was, in reality, the debt of Mr. Shattuck and Mr. Blizzard. An investigation was then made and the facts, as herein stated, discovered. Laches can not be imputed without lack of reasonable diligence, and no want of diligence is possible where the wrong is concealed and there are no means of discovering it.

*The decree is affirmed.*

NOTE BY MILLER, JUDGE:

I cannot dissent from the legal propositions enunciated in the opinion, nor deny their application to the facts as presented by the record. But in concurring I do not wish to be understood as intending in any way to impute to Mr. Shattuck wrong doing or intent to conceal from the directors of the bank the transactions complained of, or to misappropriate the funds of the bank. The record shows that the transaction especially complained of occurred during his last illness, and the loss to the bank did not appear until long after his death.

Knowing him intimately as I did for more than thirty years and the correctness of his business habits, I am satisfied he was incapable of any intention to wrong or injure his bank, and furthermore that if he had lived to see the result and loss to the bank he would never have questioned his liability to the bank, or allowed this suit to be brought against him. I deem it my duty to his memory and high character to add this note to the opinion.