## DUNLAP v. TWIN CITY POWER CO.

(Circuit Court of Appeals, Fourth Circuit. September 14, 1915.)

### No. 1316.

1. CORPORATIONS ⬦⟿448—PURCHASE OF PROPERTY—LIABILITY.

Where complainant, who had an option for the purchase of a parcel of land, agreed with the promoter of a corporation to share with him the profit on any sale above the option price, complainant cannot receive the profit, and at the same time demand from the corporation a share of the promoter's compensation for acquiring the property.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1709, 1789–1792; Dec. Dig. ⬦⟿448.]

2. CORPORATIONS ⬦⟿448—CONTRACTS—CONSTRUCTION.

Where the promoter of a corporation contracted with one of the incorporators to buy a certain parcel of land for the corporation and to receive stock as compensation, a trust relation was created, and the promoter should not attempt to make a secret profit, and, having done so, neither the promoter, nor one who was to share the promoter's compensation, can recover the stock.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1709, 1789–1792; Dec. Dig. ⬦⟿448.]

3. CORPORATIONS ⬦⟿448—CONTRACT—BREACH—EFFECT.

Where a promoter of a corporation breached his trust with respect to acquiring land, neither he nor one claiming under him may recover for other services in a suit on the contract.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1709, 1789–1792; Dec. Dig. ⬦⟿448.]

4. CORPORATIONS ⬦⟿428—NOTICE—OFFICERS.

Notice to agents of a corporation, who occupied a position inimical to it, of a secret profit made by a promoter, is not notice to the corporation, which would form a basis for acquiescence.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1748–1761; Dec. Dig. ⬦⟿428.]

5. CORPORATIONS ⬦⟿448—ISSUANCE OF STOCK—RIGHTS.

Where a corporation, without notice of a promoter's fraud, issued stock to him in compensation for his services, the issue did not irrevocably fix the promoter's rights and those of another, who was to share his profits, for a court of equity would cancel the certificates; hence, after cancellation by the corporation, the promoter's associate could not recover.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1709, 1789–1792; Dec. Dig. ⬦⟿448.]

Appeal from the District Court of the United States for the Western District of South Carolina, at Greenville; Henry A. M. Smith, Judge.

Bill by H. P. Dunlap against the Twin City Power Company. From a decree dismissing the bill, complainant appeals. Affirmed.

Joseph A. McCullough, of Greenville, S. C., and James A. Fowler, of Knoxville, Tenn. (McCullough, Martin & Blythe, of Greenville, S. C., and Fowler & Fowler, of Knoxville, Tenn., on the brief), for appellant.

E. H. Callaway, of Augusta, Ga., for appellee.

Before PRITCHARD, KNAPP, and WOODS, Circuit Judges.

WOODS, Circuit Judge. In this suit the complainant asked a decree requiring the defendant, Twin City Power Company, to specifically perform an alleged agreement to issue to him a certificate of its stock for 4,425 shares, or requiring it to pay to him $442,500 damages in case the stock cannot be delivered. Upon a hearing on the merits the bill was dismissed.

[1, 2] The complainant holding an option to purchase for $5,000 from R. L. Tucker and L. Tucker 320 acres of land on the Savannah river, including the Wring Jaw and Straight Tucker Shoals, agreed with W. H. Chew, a resident of New York, to share with him the profit of any sale above the option price. On May 16, 1900, Chew made the following agreement with George E. Fisher:

"W. H. Chew agrees to buy for party of the first part the water power and 338 acres of land known as the Wring Jaw Shoals and Straight Tucker water power on the Savannah river in the state of South Carolina and Georgia, and to secure options on all lands 10 miles above the above-named water power to and below said power as near to the city of Augusta, Georgia, as possible, for the sum of thirty thousand dollars ($30,000) or less, the land covered by the aforesaid options to be paid for, from the sale of bonds to be issued. W. H. Chew further agrees to give all the matters his entire attention from beginning to end, no matter what time it may consume.

"G. E. Fisher, party of the first part, agrees to organize a company of one million of stock and one million of bonds, the bonds to remain in the treasury of the company, for the benefit of the company. Party of the first part agrees to turn over all property thus secured to this company, to give W. H. Chew 45 per cent. of all the stock, and to retain 55 per cent. for himself. Party of the first part is to pay or cause to be paid W. H. Chew a salary of three hundred dollars per month, entire attention and time to the matter of management, and carry out the ideas of G. E. Fisher, as may be from time to time communicated."

By this agreement it is evident that Chew assumed a trust relation to Fisher and the company to be organized, and that this trust embraced the obligation to buy the lands at the lowest possible price and to give Fisher and the company to be formed the benefit of any advantage or profit. It forbade his making any profit out of Fisher or the company in the acquisition of the property. Afterwards, on May 24, 1900, Chew and Dunlap, the complainant, procured from the Tuckers a conveyance of the land embraced in the option direct to Fisher, paying the Tuckers $5,000 as agreed, and charging Fisher $23,800 as the purchase money. The nature of the transaction was concealed by Chew, and Fisher was made to believe that $23,800 was paid to the Tuckers for the land, by the device of making four drafts drawn by Chew on Fisher, all in favor of R. L. Tucker, L. Tucker, and M. L. Carrol, the grantors. One of the drafts for $5,000 was retained by the Tuckers in payment of the purchase money of the land. Of the $18,800 represented by the other three drafts, Dunlap received $9,500 and Chew $9,300. The reason for the separate drafts was thus falsely stated by Chew in his letter of May 24, 1900, to Fisher:

"I made several (four drafts in all) to suit Major Tucker, and it helped me out also, for as it is the people here don't know exactly the amount we paid for the property, and the drafts will be divided up for collection," etc.

Dunlap knew that Chew represented Fisher, and he knew that a corporation was to be formed, and that Chew, as promoter, was to

get 45 per cent. of the stock; and this was the stock which he claims Chew was to divide with him. The corporation contemplated was subsequently organized as the Twin City Power Company, and Fisher conveyed to it the lands embraced in the Tucker deed to him. Both Chew and Dunlap were incorporators and directors of the company. Of the 10,000 shares of stock, 5,500 were issued to Fisher, 20 to Chew, 20 to Dunlap, and 3,615 to Chew as trustee. These certificates, dated September 10, 1900, were immediately assigned by Dunlap and by Chew, individually and as trustee, to Fisher, who had furnished all the money for the purchase of the property and other corporate purposes. Fisher, having the certificates so assigned in his possession, late in 1900 discovered the fraud perpetrated by Chew in the purchase of the Tucker property, and in July, 1901, had all the assigned certificates canceled and new certificates issued to other parties. In May, 1906, George E. Fisher sold 8,500 shares of stock for full value to Thomas O'Connor, who purchased without notice of any claim on the part of Dunlap. Before his death in 1901, Chew executed a paper to W. C. Irons, reciting that he was entitled under his agreement with Fisher to 4,500 shares of the capital stock, and assigning one-third of it to be held by Irons for Dunlap. Irons refused to join in this action, and was made a defendant.

The suit depends on the right of the complainant Dunlap to require the corporation to carry out the agreement made between Fisher and Chew above recited, to the extent of the assignment made by Chew to Irons for complainant's benefit; the allegation of the bill being that the corporation took the property subject to Chew's contract with Fisher and was bound to carry it out as Fisher would be bound. The claim for 4,500 shares of the stock, instead of 1,500, is made under the allegation that the capital stock of the company was increased from $1,000,000 to $3,000,000. It seems plain that the complainant cannot have the advantage of the position of a seller of his option to Fisher at a profit, and at the same time receive from Fisher, the purchaser, or the corporation, his assignee, compensation for buying the property, without notice to Fisher that he was both seller and purchaser. It makes his position worse that he claimed under Chew, who not only did not inform Fisher of the real situation, but took affirmative action to deceive him into the belief that he was paying nothing more than the actual purchase money of the property. The complainant's position is thus well stated in the opinion of the District Judge:

"The only construction to be put upon the transaction compatible with the honesty of the complainant is he conceived himself to have no connection with Fisher, but to be selling to him through his agent at the agreed price the property wholly independent of and without regard to the agreement as to compensation between Chew and Fisher of 14th May, 1900."

The complainant sets out the contract between Fisher and Chew, and stakes his case on it. Assuming that he was not a party to the fraud, no more was he a party to the contract between Chew and Fisher, and, as assignee of Chew, his rights cannot rise higher than the rights of Chew.

[3] It is true that evidence was offered tending to show that on the faith of the contract both Chew and Dunlap procured options and rendered other valuable services to the corporation after the transaction with the Tuckers was closed; but, the contract between Chew and Fisher having been made void by reason of the fraud of Chew, compensation for these services could not be recovered in this suit on the contract.

[4] The evidence does not warrant the inference that the corporation acquiesced in Chew's fraud, or that notice of it was brought home to any agent or officer of the corporation who could act for it before the stock was issued to Chew as trustee. Notice to Chew, Dunlap, and Mackaye, and their acquiescence, could not bind the corporation, for their interests were antagonistic to it; all of them being claimants against the corporation of the stock which Chew was to get under his contract with Fisher. State v. Talley, 77 S. C. 99, 57 S. E. 618, 11 L. R. A. (N. S.) 938, 122 Am. St. Rep. 559; Arthur v. Brown, 91 S. C. 316, 74 S. E. 652.

[5] The position that the issuance of the stock to Chew, as trustee, for the benefit of the complainant, fixed irrevocably his right to it against the corporation, is untenable. This certificate was issued to Chew, as trustee, under an agreement with Fisher which conferred no right, because of Chew's fraud; and in consequence of that fraud the court of equity would have decreed its cancellation. In Davis v. Las Ovas Company, 227 U. S. 80, 33 Sup. Ct. 197, 57 L. Ed. 426, promoters by a shuffling device turned over to the corporation for $35,000 property for which they had paid $20,000. The court says:

"The result of the transaction was that the corporation was required to pay to those who had assumed to act for and represent it a secret profit of $15,-000, and also to compensate them for their services in buying the land and organizing the company by issuing to each of them $15,000 in nonassessable shares of its stock. * * * Those of the syndicate assuming to act for the corporation in acquiring the property were under obligation to disclose the truth and deal openly. In the absence of such disclosure, the corporate assent was obtained on false grounds. The wrong was done when those members of the syndicate not in complicity with appellants subscribed to the stock of the company and aided their guilty associate managers in the corporate action necessary to the corporate acquisition of the property at the exaggerated price placed upon it by those who were to realize a secret profit. Thus the original fraud practiced upon some of those associated with them in the promoters' arrangement became operative against the corporation itself. The standing of the corporation results from the fact that there were innocent and deceived members of the corporation when the property was taken over by it."

The suit being expressly based on a contract which was avoided by the fraud of Chew, the bill was properly dismissed. As this conclusion disposes of the case, it is unnecessary to decide whether the corporation was bound to inquire into Fisher's authority to transfer the stock issued to him as trustee. We express no opinion as to the right of the complainant to recover against the corporation or Fisher for the value of his services.

Affirmed.