**CLIFTON et al. v. TOMB (two cases).**

Circuit Court of Appeals, Fourth Circuit.
October 18, 1927.

Nos. 2582, 2625.

**1. Dismissal and nonsuit ⊕⇒18—Plaintiff has undisputed right to dismiss bill before final hearing, unless defendant has acquired substantial right which would be injured by dismissal.**

Ordinarily, it is undisputed right of plaintiff to dismiss his bill in equity without prejudice before final hearing on payment of costs, unless dismissal would prejudice defendant in some way other than mere prospect of being vexed by future litigation of the same kind, but this right ceases to exist when defendant has acquired, in the course of the proceedings, some substantial right or advantage of which he would be deprived or which might be lost or rendered less efficient by dismissal.

**2. Courts ⊕⇒351½—Defendant had right to have counterclaim not replied to taken pro confesso, and court erred in granting plaintiff's motion to dismiss bill and counterclaim without prejudice (equity rules of 1912, Nos. 16, 31).**

Where plaintiff suing in equity failed to reply to defendant's counterclaim setting up legal cause of action, defendant had right to have counterclaim taken pro confesso and to proceed thereon ex parte for judgment under equity rules of 1912, Nos. 16, 31, and court erred in granting plaintiff's motion to dismiss the bill and counterclaim without prejudice to pending action at law against same defendants on same transactions and in denying defendant's motion for judgment on counterclaim.

**3. Equity ⊕⇒420—When bill is taken pro confesso, defaulting party has no standing in court and cannot adduce any evidence or be heard (equity rule No. 16).**

When a bill is taken pro confesso under equity rule No. 16, because of party's default, though court will give only such relief as is proper on the bill, the party himself has lost his standing in court, and cannot appear in any way or adduce any evidence or be heard at the final hearing.

**4. Courts ⊕⇒354—Party in default should show good cause before default pro confesso is set aside (equity rule No. 5).**

Though court has inherent power and also power under equity rule No. 5 to set aside a decree pro confesso, the party in default should show good cause before the default is set aside.

**5. Equity ⊕⇒420—Bill confessed by default is deemed true in matters alleged with certainty but matters not alleged with certainty or not admitting of certainty must be proved.**

Bill confessed by defendant's default is deemed true in all matters alleged with sufficient certainty, but, in respect to matters not alleged with due certainty or subjects which from their nature require an examination in detail, complainant must furnish proof, and there is a strict analogy in this respect between defaults in actions at law and proceedings on bills pro confesso in equity.

**6. Courts ⊕⇒356(5)—Plaintiff cannot entirely ignore counterclaim setting up legal cause of action in equity suit, but must raise objection in trial court (equity rule No. 30).**

Even if defendant cannot, under equity rule No. 30, set up as counterclaim in equity suit a legal cause of action arising out of transactions which are the subject of the equity suit, plaintiff cannot ignore such counterclaim entirely, but must raise that objection before the District Court by some appropriate method.

**7. Courts ⊕⇒342—Jury ⊕⇒28(11)—Legal, demand may be interposed by counterclaim in equity suit involving same transaction, and defendant thereby waives jury trial, but cannot thereby deprive plaintiff of right to jury trial (equity rule No. 30).**

Under equity rule No. 30, a legal demand growing out of the same transaction set forth in bill in equity may be interposed by counterclaim in the equity suit, and by doing so defendant waives its right to a jury trial thereon, but does not take away any right plaintiff may have to a jury trial on the issues of fact raised by the counterclaim, and defendant, after pleading its counterclaim and obtaining a position of advantage, cannot be deprived of this position merely because counterclaim is legal and not equitable.

**8. Corporations ⊕⇒575—Secret agreement to deliver option to purchase all stock of corporation to promoter of new corporation to be paid for with stock in new corporation held fraudulent and unenforceable.**

Where plaintiff transferred option to purchase all the stock of an existing corporation to C. under secret agreement for payment in stock of a new corporation to be organized to take over the stock of the existing corporation and that plaintiff should give his notes for such stock received by him as though it were a bona fide subscription, but should not be called on to pay the notes, held that, in absence of notice of the agreement to stockholders or officers of new corporation, agreement was unenforceable as fraud on corporation and its stockholders, and plaintiff was precluded from denying liability on the subscription notes.

**9. Contracts ⊕⇒113(1)—Contract intended to or which perpetrates fraud is illegal, void, and unenforceable.**

Any contract having for its object or which in effect perpetrates a fraud on a third person is illegal and void and therefore unenforceable either in equity or at law.

**10. Corporations ⊕⇒448(1)—Corporation is not liable on contract made by promoter before its organization, unless it subsequently becomes so by its own act.**

Since a corporation before its organization cannot have agents and is unable to contract, it is not liable on any contract which a promoter attempts to make for it unless it becomes so by its own act after its incorporation is completed.

**11. Corporations ⊕⇒448(1)—To become bound by its promoter's contracts, made before its organization, corporation must have full knowledge or notice leading to knowledge on reasonable inquiry.**

In order that a corporation may become bound on contracts made by its promoters be-

**12. Corporations ⊕428(4)—Promoter's knowledge is not imputable to corporation.**

As a general rule, the knowledge of a mere promoter is not to be imputed to the corporation.

**13. Principal and agent ⊕180—Rule that agent's knowledge is imputed to principal does not apply where agent's interest is antagonistic to principal.**

The general rule that knowledge of an agent is imputed to the principal rests on the presumption that the agent will disclose what it is his principal's business to know and the agent's duty to impart, but rule does not apply where agent having personal interest in the matter antagonistic to interests of his principal contracts with principal.

**14. Corporations ⊕428(4)—Promoter's knowledge of his secret agreement respecting purchase of option held not imputable to corporation.**

Where plaintiff transferred option to purchase all the stock of an existing corporation to C. under secret agreement for payment in stock of a new corporation to be organized, and that plaintiff should give his notes for such stock as though it were a bona fide subscription, but should not be called on to pay the notes, *held* that promoter's knowledge of the agreement was not imputable to the new corporation even if promoter be regarded as its agent, because promoter's personal interest was antagonistic to interests of corporation.

**15. Corporations ⊕575—Principle that fraudulent contract, adding nothing to original obligation, is enforceable, held inapplicable, where original contract called for payment in money and substituted contract required payment in stock in new corporation.**

Principle that contract tainted by fraud, which does not add anything to the original obligation for which it was substituted, and therefore causes no damage, is enforceable, *held* inapplicable, where, for original contract requiring promoter to pay cash for option to purchase stock in existing corporation, parties substituted agreement under which promoter was to deliver stock in a new corporation to be organized, which stock parties expected to be worth far more than par value.

**16. Contracts ⊕138(1)—Action at law held not maintainable as between parties in pari delicto on contract tainted with fraud.**

Action at law *held* not maintainable as between parties in pari delicto on contract tainted with fraud.

Appeal from and in Error to the District Court of the United States for the Southern District of West Virginia, at Bluefield; George W. McClintic, Judge.

Suit in equity by M. H. Tomb against J. B. Clifton and another, and action at law by M. H. Tomb against J. B. Clifton and another. A decree and a judgment adverse to defendants were rendered in the equity and law actions, respectively, and defendants appeal and bring error. Reversed and remanded.

Ashton File, of Beckley, W. Va. (File, Goldsmith & Scherer, of Beckley, W. Va., on the brief), for appellants and plaintiffs in error.

Russell S. Ritz, of Bluefield, W. Va., for appellee and defendant in error.

Before NORTHCOTT, Circuit Judge, and SOPER and ERNEST F. COCHRAN, District Judges.

ERNEST F. COCHRAN, District Judge. These two cases concerned the same transactions between the same parties and were heard together in this court, and may be disposed of in one opinion, though a separate discussion of some of the questions involved may be to some extent necessary. In No. 2582, a bill in equity was brought by the appellee, M. H. Tomb, against J. B. Clifton and Raven Red Ash Coal Company, a corporation, the appellants in this court. In No. 2625, an action at law was brought by the same plaintiff, M. H. Tomb, against the same defendants, and in this case the defendants below are the plaintiffs in error here. For convenience, the parties will be referred to as they appeared in the court below, namely, M. H. Tomb as plaintiff, and J. B. Clifton and Raven Red Ash Coal Company as the defendants, and the cases will be referred to as the equity case and the law case, respectively. In the transactions involved in the two cases, there were two corporations concerned, of the same name: Raven Red Ash Coal Company, a corporation of Virginia, and Raven Red Ash Coal Company, a corporation of West Virginia, and they will be spoken of as the Virginia corporation and the West Virginia corporation.

In the law case and also in the equity case, the West Virginia corporation interposed a counterclaim on certain notes given by the plaintiff, Tomb, for stock subscription. The counterclaims are identical, being based upon the same notes for the same stock subscription.

Inasmuch as this court has reached the conclusion, upon the merits of the case, that the plaintiff is not entitled to recover either in the law or in the equity case, and that the West Virginia corporation is entitled to recover against the plaintiff on its counterclaim, it is perhaps of no importance to the defendants whether the equity case should be considered or not, or whether the West Virginia

corporation should recover on its counter-claim in the law case or in the equity case. But as in the equity case there is involved an important question of practice, we deem it advisable to consider the equity case and first decide the questions presented in that case.

In the equity case, the plaintiff, Tomb, filed his original bill against the defendant Clifton and the Virginia corporation on April 27, 1925. It would appear from the record that this bill was filed against the Virginia corporation for the reason that the plaintiff was not aware at that time of the organization of the West Virginia corporation. The original bill alleged in substance, a contract between the plaintiff and the defendant Clifton, whereby the plaintiff was to receive $20,-000 of the capital stock of the corporation in consideration of his having turned over and sold to Clifton and the corporation a certain option or the right to purchase all of the capital stock of the Virginia corporation, and prayed for specific performance by the defendants of this agreement. On May 16, 1925, Clifton and the Virginia corporation filed separate answers to this bill. On May 28, 1925, the plaintiff gave notice of a motion to take the deposition of D. C. Yates on June 8, 1925; and the deposition was taken at Middlebourne, W. Va., on June 10, 1925, and filed in the cause.

On June 26, 1925, the following proceedings were had in the equity case: (1) The defendants moved to dismiss the original bill, which was resisted by the plaintiff, and the motion was overruled by the court. (2) Thereupon the plaintiff moved to dismiss the case as to the Virginia corporation, which motion was granted and the case dismissed as to that defendant. (3) Thereupon the plaintiff tendered and asked leave to file an amended bill, to which the defendants objected; but the court overruled the objection and permitted the amended bill to be filed. (4) Thereupon the defendant Clifton moved to dismiss this (first) amended bill, which motion the court refused. (5) Thereupon the defendant Clifton asked leave to file his answer to the first amended bill, which answer was filed and to which answer the plaintiff replied generally. (6) Thereupon the plaintiff moved to transfer the case to the law side of the court, which was opposed by the defendant Clifton, and the motion was thereupon overruled by the court.

The first amended bill (in which Clifton was the sole defendant) set forth, in substance, the sale by the plaintiff to Clifton of the option for the purchase of all of the capi-tal stock of the Virginia corporation, for which it was alleged Clifton agreed to pay $20,000, and that afterwards he had agreed that, instead of paying plaintiff $20,000, he would deliver to him that amount of stock of the West Virginia corporation which he expected to organize. The first amended bill also alleged that in that transaction Clifton did not represent any person or corporation as being the purchaser of the option, and that all of the agreements and understandings which the defendant Clifton had with the plaintiff were made by Clifton on his own account, and that neither of the corporations (that is, neither the Virginia nor the West Virginia corporation) ever agreed to issue the plaintiff any of its capital stock in consideration of turning over the option to Clifton, and that the defendant Clifton had agreed on his own account, and not as the representative of any corporation, to give the plaintiff, in lieu of $20,000 in money, $20,000 in stock in the company. The bill alleged a breach of this contract, and prayed that the defendant Clifton be required to perform his agreement or that a decretal judgment be entered against him for the value of the stock.

On July 23, 1925, the plaintiff moved for leave to file a second amended bill, which motion was granted. The second amended bill made the West Virginia corporation a new party defendant, and process was duly served upon that corporation. The second amended bill alleged, in substance, that the plaintiff had become the owner of the option for the purchase of all of the capital stock of the Virginia corporation, and that Clifton had become the purchaser of this option from plaintiff, agreeing to pay for it the sum of $20,000, and that the option was thereupon turned over to Clifton, who purchased all of the stock of the Virginia corporation for himself and his associates, and that, after purchasing it, Clifton proposed to give the plaintiff, instead of $20,000 in cash, $20,000 of the capital stock of the proposed corporation, namely, the West Virginia corporation, to which the plaintiff agreed, and that the plaintiff executed certain notes to the West Virginia corporation for his stock, but it was with the understanding and agreement on the part of Clifton that it was a matter of form, and that the plaintiff would never have to pay those notes. The bill also alleged that Clifton and the West Virginia corporation by means of the option had acquired all the stock and property of the Virginia corporation. The bill alleged the refusal of Clifton and the West·Virginia corporation to comply

with the agreement, and prayed that the notes should be canceled, and that he be given a decretal judgment against the defendants for the value of the stock.

On October 1, 1925, Clifton and the West Virginia corporation filed separate answers to the second amended bill, and in its answer the West Virginia corporation set up as a counterclaim against the plaintiff the notes of plaintiff for the stock subscription. The plaintiff never filed any reply to this counterclaim.

On July 24, 1925, the plaintiff brought his action at law against Clifton and the West Virginia corporation. The action was in assumpsit, and set forth that the original agreement was made by the defendants with the plaintiff for the purchase of the option for the sum of $20,000, and that the substituted agreement, whereby the option was to be paid for in 200 shares of the par value of $100 each, of the capital stock of the West Virginia corporation, was made with him by both defendants, that the defendants had refused to pay the same, and that plaintiff had been damaged in the sum of $30,000, for which he demanded judgment.

On June 15, 1926, in the equity case, the following proceedings were had: The plaintiff moved to dismiss his bill in equity without prejudice to his rights to maintain his action at law then pending against the same defendants, and also moved to dismiss the counterclaim, and the West Virginia corporation moved for a decree in its favor against the plaintiff on its counterclaim. The court refused the motion of the West Virginia corporation for a decree on its counterclaim, and, over the objection of defendants, granted the plaintiff's motion and dismissed the bill in equity, and the counterclaim of the West Virginia corporation, without prejudice, however, to the right of the plaintiff to maintain the action at law then pending, and without prejudice also to the right of the West Virginia corporation to assert its counterclaim in that action.

In the law case, on June 23, 1926, Clifton and the West Virginia corporation were allowed to file a joint plea of non assumpsit, and the West Virginia corporation was also allowed to file its counterclaim against the plaintiff on the notes for the stock subscription referred to. The West Virginia corporation also filed a special plea of estoppel, setting forth in substance that the plaintiff, in his first amended bill in the equity case, had solemnly plead that his agreement was solely with Clifton and that neither the West Virginia corporation nor the Virginia corpora-

tion had any part therein, etc., and therefore the plaintiff could not maintain the action at law against the corporation. Upon the issues thus joined, in the law case, there was a trial before a jury, which resulted in a verdict against both defendants for the sum of $10,000.

On the appeal in the equity case, appellants by their assignments of error present two questions for the consideration of this court: (1) Did the District Court err in dismissing the bill in equity and the West Virginia corporation's counterclaim? and (2) Did that court err in refusing to allow the West Virginia corporation to proceed upon its counterclaim pro confesso?

[1] In the federal courts, it is the well-established rule that ordinarily it is the undisputed right of the plaintiff to dismiss his bill in equity without prejudice before final hearing on payment of costs, except where the dismissal of the bill would prejudice the defendant in some other way than by the mere prospect of being harassed and vexed by future litigation of the same kind. But this right ceases to exist when the defendant has acquired in the course of the proceedings some substantial right or advantage of which he would be deprived, or which may be lost or rendered less efficient by dismissal. Pullman Palace Car Co. v. Central Transportation Co., 171 U. S. 138, 146, 18 S. Ct. 808, 43 L. Ed. 108; Ex parte Skinner & Eddy Corporation, 265 U. S. 86, 93, 44 S. Ct. 446, 68 L. Ed. 912; American Bell Tel. Co. v. Western Union Tel. Co. et al. (C. C. A. 1st) 69 F. 666, 670; Smith v. Carlisle (C. C. A. 5th) 228 F. 666, 668; Sauter v. First Nat. Bank (C. C. A. 7th) 8 F.(2d) 121, 123; Jamison v. Fullerton et al. (D. C.) 3 F.(2d) 312; City of Detroit v. Detroit City Ry. Co. (C. C.) 55 F. 569, 573. In the case of Ex parte Skinner & Eddy Corporation, supra, the Supreme Court, Mr. Chief Justice Taft delivering the opinion, used the following language:

"It is ordinarily the undisputed right of a plaintiff to dismiss a bill in equity before final hearing. * * * The right to dismiss, if it exists, is absolute. * * * The usual ground for denying a complainant in equity the right to dismiss his bill without prejudice at his own cost is that the cause has proceeded so far that the defendant is in a position to demand on the pleadings an opportunity to seek affirmative relief and he would be prejudiced by being remitted to a separate action. Having been put to the trouble of getting his counter case properly pleaded and ready, he may insist that the cause proceed to a decree." Ex parte Skin-

ner & Eddy Corporation, supra, 93, 94 (44 S. Ct. 447, 448).

[2] In this case, the West Virginia corporation had not only been put to the trouble of getting its counterclaim pleaded and ready, but, by the default of the plaintiff in failing to reply thereto, it had acquired the substantial right of having its counterclaim taken pro confesso and proceeding thereupon ex parte for judgment.

[3, 4] Rule 31 of the equity rules promulgated in 1912 provides that, when the answer includes a counterclaim, the party against whom it is asserted shall reply within ten days after the filing of the answer, unless a longer time be allowed by the court or judge, and that, in default of a reply, a decree pro confesso on the counterclaim may be entered as in default of an answer to the bill. Rule 16 provides that, where there is a default in answering the bill, the plaintiff may at his election take an order as of course that the bill be taken pro confesso, and thereupon the cause shall be proceeded in ex parte. When a party is in default and a bill taken pro confesso, while the court will give only such relief as is proper upon the bill, nevertheless the party himself has lost his standing in court, cannot appear in any way, cannot adduce any evidence, and cannot be heard at the final hearing. Frow v. De La Vega, 15 Wall. 552, 554, 21 L. Ed. 60; Thomson v. Wooster, 114 U. S. 104, 112, 113, 114, 5 S. Ct. 788, 29 L. Ed. 105. It is true that it is within the inherent power of the court to set aside a decree pro confesso (O'Brien v. Lashar [C. C. A. 2d] 273 F. 520), and the court has that power also by equity rule No. 5. But the party in default should show good cause before the default should be set aside. Furthermore, rule 17 provides that, when the bill is taken pro confesso, the court may proceed to a final decree at any time after the expiration of thirty days after the entry of the order pro confesso, and such decree shall be deemed absolute unless the court shall at the same term set aside the same or enlarge the time for filing the answer upon cause shown upon motion and affidavit; and the party must also submit to such other terms as the court shall direct. The plaintiff made no motion to set aside the default or for leave to reply to the counterclaim. If he had made such motion and had shown some excuse for his failure to reply, the court could have allowed him to file his reply. But he should not be permitted simply to ignore the counterclaim altogether.

[5] When the allegations of a bill are distinct and positive and the bill is taken as confessed, such allegations are usually taken as true without proofs, and the decree will be made accordingly. But when the allegations of a bill are indefinite or the demand of the complainant is in its nature uncertain, the certainty requisite to a proper decree must be afforded by proofs. The bill, when confessed by the default of the defendant, is taken to be true in all matters alleged with sufficient certainty; but, in respect to matters not alleged with due certainty, or subjects which from their nature require an examination in detail, the obligation to furnish proofs rests on the complainant. There is a strong, and indeed a strict, analogy in this respect between defaults in actions at law and proceedings upon bills pro confesso in equity. Thomson v. Wooster, 114 U. S. 104, 111, 5 S. Ct. 788, 29 L. Ed. 105; Central R. R. Co. v. Central Trust Co., 133 U. S. 83, 90, 10 S. Ct. 235, 33 L. Ed. 561.

In the present case the counterclaim was based upon notes, and there was therefore the requisite certainty upon which a decree could be rendered without further proofs.

It is clear, therefore, that the West Virginia corporation had acquired a substantial right upon its counterclaim, which would be lost or rendered less efficient, if the bill in equity and counterclaim should be dismissed. The dismissal of the bill and the counterclaim, we think, was plain error. We think it was error also to refuse the motion of the West Virginia corporation for a decree in its favor against the plaintiff for the amount of its counterclaim.

It is to be observed that the defendant Clifton had been put to the trouble of answering the original bill and two amended bills, and appearing at the taking of the deposition of Yates, and he had appeared and resisted the motion to transfer the first amended bill to the law side; and, while we do not care to base our decision upon these facts, nevertheless they are circumstances which tend to strengthen the contention of the defendants that the bill and counterclaim thereto should not have been dismissed.

[6, 7] The plaintiff, however, contends that the West Virginia corporation's counterclaim is a legal action and cannot be interposed in an equity cause, and that he was therefore not in default in failing to reply, and consequently had the right to have his bill dismissed. Even if it should be conceded that the defendant cannot, under equity rule 30, set up a legal cause of action arising out of transactions which are the subject of the equity suit, we do not think that the plaintiff would be entitled to ignore such coun-

terclaim entirely. If he conceived that a counterclaim could not properly be interposed, it would be his duty to raise that objection before the District Court by some appropriate method, which was not done in this case. However, we do not think that the plaintiff is correct in his contention that the West Virginia corporation could not interpose the legal demand in the equity cause. The plaintiff relies upon American Mills Co. v. American Surety Co., 260 U. S. 360, 43 S. Ct. 149, 67 L. Ed. 306. But that case does not hold that a party may not set up a legal counterclaim growing out of the transaction set forth in the bill, but simply holds that he is not required by rule 30 to do so. In that very case, the defendant did actually set up a legal counterclaim, and the court held that he was not required by rule 30 to do so, but that, when he did file it, he waived his objection that the bill should have been dismissed on the ground that there was an adequate remedy at law. We agree with the late Judge Rose in his interpretation of that case, in his work on Federal Procedure. Judge Rose says:

"In a thorough review of the whole subject, Chief Justice Taft, speaking for the court, has in effect said: First, that, if the defendant conceives himself to have an equitable counterclaim arising out of the transaction which is the subject-matter of the suit, he *must* set it up in his answer, whether as an independent cause of action it would or would not have been within the federal jurisdiction. Second, if he has an equitable claim against the plaintiff which might have been made the basis of an independent suit in equity, he *may* so set it up, although it is not related to the subject-matter of the suit; in that connection Buffalo Specialty Co. v. Vancleef (D. C.) 217 F. 91, is expressly cited with approval. Third, that he is not required to set up a cross-demand essentially legal in its nature, whether such demand does or does not grow out of the same transaction. Fourth, that, if he does set up a legal demand, he has waived, so far as he is concerned, a right to a jury trial thereon, and has consented that it shall be heard and determined by the chancellor as one of the issues in the equity cause. His action in so doing, however, cannot take away from the plaintiff any right the latter may previously have had to insist, if he will, that the issues of fact upon the legal counterclaim shall be tried at law and to a jury." Rose's Federal Jurisdiction and Procedure (3d Ed.) 487, 488.

We think, therefore, that the West Virginia corporation could interpose its counterclaim in this case, growing, as it did, out of the transaction set forth in the bill, and that by doing so it waived its right to a jury trial thereon, but did not take away any right the plaintiff may have had to a jury trial, upon the issues of fact on the counterclaim, if there had been a reply and issues joined; and, having pleaded its counterclaim and obtained a position of advantage, it could not be deprived of this position merely because its counterclaim was legal and not equitable.

We come now to the consideration of the law case. By a motion for a direction of a verdict, certain requests for instructions and exceptions to the charge of the court, and exceptions to the giving of instructions on behalf of the plaintiff, the defendants raised certain questions which are vital to the case of the plaintiff on the merits and the West Virginia corporation's right to collect the plaintiff's notes given for the stock subscription; and these points are now presented in this court by proper assignments of error.

While the declaration set forth the original agreement between plaintiff and Clifton for the sale of the option for the sum of $20,000, the action was based upon the substituted agreement whereby the plaintiff was to receive $20,000 of the stock of the West Virginia corporation instead. The defendants not only denied the agreement, but set forth their version of what the real agreement was, and the West Virginia corporation in addition filed its counterclaim on the notes and a special plea in estoppel. In support of the plea of estoppel, the whole record in the equity suit was introduced at the trial of the law case. There was a conflict of testimony at the trial of the law case as to what the real agreement was in reference to the transfer of the option to Clifton; Clifton and the West Virginia corporation contending that the only consideration was that the plaintiff should have the right to subscribe for $20,000 of stock in the new corporation and that the corporation would take his notes and carry them for him as long as was reasonable, the expectation being that the stock would prove very valuable, and that the notes could be paid from the profits from the stock. This was denied by the plaintiff, and, in considering the question upon the motion to direct a verdict, we shall consider the evidence in the aspect most favorable to the plaintiff.

[8] Taking this evidence in its most favorable aspect to the plaintiff, the facts are as follows: In the year 1920, the Virginia corporation, Raven Red Ash Coal Company, was

considered by the plaintiff and others as a very valuable property; and plaintiff at that time obtained for himself and certain associates, from one Dr. Williams, an option for the purchase of the entire stock of this corporation on certain terms, the details of which it is not necessary to state. The option was taken in his name. Before any of these suits were brought, any interest which any of his associates may have had in the option with him was eliminated, and he became the sole owner of all the interests in the option. He approached Clifton about the matter, and, after some preliminary understanding between him and Clifton, which is not material, he finally agreed to transfer the option to Clifton for the sum of $20,000. He then transferred the option to Clifton. At that time, the West Virginia corporation had not been formed. Afterwards, the plaintiff and Clifton agreed that, in lieu of the $20,000 to be paid for the option, the plaintiff should receive $20,000 in stock of a company which Clifton and certain associates of his intended to form, to take over the stock of the Virginia corporation under the option, and that the plaintiff should give his notes therefor, as if a bona fide subscriber for that amount of stock, but merely as a matter of form, and that he should never be called upon to pay the notes; and it was understood between Clifton and the plaintiff that the fact that he was to obtain this stock and was not to pay the notes was to be kept secret. There was some uncertainty apparently in plaintiff's testimony in chief as to whether the agreement for secrecy was made at the time the agreement was made by which he was to receive the stock in lieu of money, or at some later period. But the testimony in reply shows clearly that the agreement for secrecy was a part of the agreement by which he was to receive stock in lieu of money. We quote from the record the plaintiff's testimony on this point as follows:

"That he was not in Beckley the next day after the deal was closed with Dr. Williams. He was not in Beckley for several weeks after that. It was before that that Clifton made his agreement with the witness in reference to paying him for his option. That it was part of his original agreement with Clifton for compensation which he was to receive for the option that Tomb was to keep secret how Clifton was to get this 200 shares of stock for him.

"Q. Why did he say that? A. He said that this company would not stand for any 'watered stock.' He says, 'I know the other stockholders will not stand for any bonus in this,' and then I said, 'But you have promised this to me; that is nothing to me.'

"Q. How did he say he would have to handle it? A. He said he would go ahead and have me to give the notes, and that he would then have the stock issued to me.

"Q. What did he say about the notes? A. He said that the notes would never be held against me, and that I would never be asked to pay them.

"Q. Did you keep secret the understanding that you had with Clifton up to the time that you found out that he was not going to carry it out? A. Up until 1923 when I told Dr. Thornhill about it."

Clifton took over the option for the benefit of himself and fifteen or eighteen other stockholders. There were no written subscriptions by the stockholders of the West Virginia corporation. The West Virginia corporation was formed, and Clifton had the option transferred to that corporation. By these means, the West Virginia corporation acquired all of the stock of the Virginia corporation. There was no evidence that any of the officers, stockholders, or corporators of the West Virginia corporation had any notice that the plaintiff was to receive anything for the option under either the original agreement with Clifton for payment in money, or the substituted secret agreement for payment in stock. The plaintiff gave his notes for the stock, pursuant to his understanding with Clifton, and the notes were carried by the corporation. Later, certain stock assessments were made, and the plaintiff gave his notes for those assessments, with the same understanding, as he testified, with Clifton: That they were not to be paid, but that this agreement should be kept secret.

[9] The District Court refused to direct a verdict in favor of the West Virginia corporation, and charged the jury, in substance, that, if they found that the agreement existed with Clifton, the West Virginia corporation would be bound by it, and that they should find a verdict against both defendants; and to this the defendants duly excepted. Under these facts, we think the verdict should have been directed in favor of the West Virginia corporation. The substituted agreement upon which the action is based was a fraud upon the corporation and the other stockholders, and should not be enforced. The fraudulent taint attending this transaction prevents the plaintiff from enforcing the alleged contract for the payment to him of the stock of the corporation, and prevents him also from

denying his liability upon the notes. Any contract having for its object or which in effect perpetrates a fraud on a third person is illegal and void, and therefore unenforceable, either in equity or at law. Dent v. Ferguson, 132 U. S. 50, 10 S. Ct. 13, 33 L. Ed. 242; McMullen v. Hoffman, 174 U. S. 639, 19 S. Ct. 839, 43 L. Ed. 1117; Horbach v. Coyle (C. C. A. 8th) 2 F.(2d) 702; Roberts v. Criss (C. C. A. 2d) 266 F. 296, 302, 11 A. L. R. 698; Reiff v. Nebraska-California Colony Co. (C. C. A. 8th) 277 F. 417; Boushall v. Stronach, 172 N. C. 273, 90 S. E. 198; Huster v. Newkirk Creamery & Ice Co., 42 Okl. 440, 141 P. 790, L. R. A. 1915A, 390; American Mfg. Co. v. Crescent Drug Co., 113 Miss. 130, 73 So. 883, L. R. A. 1917D, 482.

The plaintiff, however, asserts that the contract, even assuming it to be fraudulent, is enforceable because under the substituted contract the defendants were not compelled to do anything more than they were already under a legal obligation to do. He relies on the proposition that, where a party is induced by fraud to enter into a contract, and that contract does not call for him to do anything more than he would be obliged to do in any event, there is no damage, and the contract is therefore enforceable, and he cites in support of his proposition Bank v. Broyles, 16 N. M. 414, 120 P. 670, Ming v. Woolfolk, 116 U. S. 599, 6 S. Ct. 489, 29 L. Ed. 740, and certain other decisions and text-writers. The plaintiff's theory is that, when Clifton entered into the original agreement for the payment in money, both he and the West Virginia corporation became legally obligated on that contract, and that the substituted contract calling for the payment in stock was practically the same thing and did not compel either of the defendants to perform more than what they were legally bound to do under the original agreement.

[10, 11] There are two conclusive answers to this theory. In the first place, the West Virginia corporation was not legally bound by the original contract made with Clifton. At that time that corporation had not been formed. Clifton was merely a promoter, as it is termed, and one of the incorporators of the corporation when it was formed. Since a corporation before its organization cannot have agents, and is unable to contract or be contracted with, it is not liable upon any contract which a promoter attempts to make for it, unless it becomes so by its own act after its incorporation is completed. Note, 17 A. L. R. 454, and cases cited; 7 R. C. L. 80. But there are cases where a corporation becomes bound for the contracts of its promoters. While there are many decisions holding corporations liable in such cases, the courts have had great difficulty in finding a scientific or rational basis for sustaining such liability. The usual grounds that have been suggested are ratification, adoption, novation, and that the proposition made to the promoters is a continuing offer to be accepted or rejected by the corporation when it comes into being, and upon acceptance becomes an original contract on its part; and the liability has also been sustained on the ground that the corporation, by accepting the benefits of a contract, takes it cum onere, and is estopped to deny its liability on the contract. See note, 17 A. L. R. 452–512, where the subject is discussed at length and numerous cases cited. It is upon this latter ground, apparently, namely, the retention of benefits, that the plaintiff seeks to sustain its contention that the West Virginia corporation became bound by the original contract between the plaintiff and the defendant Clifton for the payment in money for the option. This is really based upon the theory of implied ratification. But, whatever may be the proper legal theory by which corporations may be bound by the contracts of their promoters, it is necessary in all cases that the corporation should have full knowledge of the facts, or at least should be put upon such notice as would lead, upon reasonable inquiry, to knowledge of the facts. It is obvious that, if corporations could be held bound by all the secret undisclosed contracts of their promoters, few men would care to risk subscribing to their capital stock. Such, however, is not the law; and all the cases that we have been able to find hold that there must be knowledge on the part of the corporation. Buffington v. Bardon, 80 Wis. 635, 50 N. W. 776; Teeple v. Hawkeye Gold Dredging Co., 137 Iowa, 206, 114 N. W. 906; Rideout v. National Homestead Ass'n, 14 Cal. App. 349, 112 P. 192; Peek v. Steinberg, 163 Cal. 127, 124 P. 834; Gardiner v. Equitable Office Bldg. Corp. (C. C. A. 2d) 273 F. 441, 17 A. L. R. 431; Huster v. Newkirk, 42 Okl. 440, 141 P. 790, L. R. A. 1915A, 390; 14 C. J. 259, 260, and note (e), p. 261, and cases cited; note, 17 A. L. R. 466, and cases cited. Though not strictly in point but illustrative of the principle, see, also, Western Nat. Bank v. Armstrong, 152 U. S. 346, 352, 14 S. Ct. 572, 38 L. Ed. 470; Gen. Inv. Co. v. American Hide & Leather Co., 97 N. J. Eq. 230, 127 A. 659; Sears v. Corr Mfg. Co., 242 Mass. 395, 136 N. E. 266.

[12] The plaintiff contends, however, that

Clifton of course knew of his agreement to pay $20,000 for the option, and that his knowledge should be imputed to the corporation. The knowledge of a mere promoter is not to be imputed to the corporation, as a general rule. Gardiner et al. v. Equitable Office Bldg. Corp. (C. C. A. 2d) 273 F. 441, 17 A. L. R. 431; 7 R. C. L. 302.

[13, 14] The only theory upon which Clifton's knowledge could be imputed to the West Virginia corporation would be upon the assumption that he was an agent of the corporation. We cannot see how he could be the agent of the corporation at a time when it had not been formed. But, even if we assume that he was an agent of the corporation, nevertheless, his knowledge could not be imputed to the corporation, because of his personal interest in the transaction. The general rule that the knowledge of the agent is imputed to the principal rests upon the presumption that the agent will disclose what it is his principal's business to know and the agent's duty to impart. But, where the agent contracts with his principal and has a personal interest in the matter antagonistic to the interest of the principal, the rule does not apply, because in such a case there is no reason to presume that the agent will impart information which it is to his interest to suppress. Gardiner v. Equitable Office Bldg. Corp. (C. C. A. 2d) 273 F. 441, 17 A. L. R. 431; 7 R. C. L. 657, 658; Dunlap v. Twin City Power Co. (C. C. A. 4th) 226 F. 161; Citizens' Nat. Bank v. Blizzard, 80 W. Va. 511, 93 S. E. 338, L. R. A. 1918A, 129; Bank v. Bryan, 72 W. Va. 29, 78 S. E. 400; American Nat. Bank v. Ritz, 70 W. Va. 409, 74 S. E. 679, 40 L. R. A. (N. S.) 156; Rusmissell v. White Oak Stave Co., 80 W. Va. 400, 92 S. E. 672, L. R. A. 1917F, 453; American Nat. Bank v. Miller, 229 U. S. 517, 521, 33 S. Ct. 883, 57 L. Ed. 1310; Mutual Life Ins. Co. of New York v. Hilton-Green, 241 U. S. 613, 622, 623, 36 S. Ct. 676, 60 L. Ed. 1202.

There was nothing in the option itself which gave any notice that the original holder, the plaintiff, was to be paid anything for it. Clifton's agreement to pay $20,000 for it was a personal obligation of his own. When he transferred the option to the corporation, it would have been against his interest to have disclosed that there was an obligation on his part to pay for it the sum that had been promised to plaintiff. It cannot be presumed, therefore, that he would have disclosed this fact to the corporation, and it certainly cannot be presumed that he would have disclosed to it the secret arrangement which the plain-

tiff alleges was had between them whereby the plaintiff was to receive stock of the company in payment for his interest in the option.

The plaintiff cites, in support of his contention on this point, the case of Wallace v. Eclipse Pocahontas Coal Co., 83 W. Va. 321, 98 S. E. 293. But in that case the court held that all the stockholders participating in the first meeting had such notice of the contract in question as would have put them on inquiry. So also in Mulverhill v. Vicksburg R., Power & Mfg. Co., 88 Miss. 689, 40 So. 647, the court held that, when the corporation accepted the benefits of the contract, it did so *with full knowledge* of all the parties concerned in its organization of the manner and conditions under which it had been obtained. Here it appears that Clifton was the only one of the corporators who had any knowledge at all upon the subject. In Simmons Creek Coal Co. v. Doran, 142 U. S. 417, 12 S. Ct. 239, 35 L. Ed. 1063, the question there related to a defect in title. The corporation claimed title through the corporators. The Supreme Court held that all the corporators and the president had knowledge or actual notice which should be imputed to the corporation. Page 436 (12 S. Ct. 245). It is clear that this case affords no support for the contention of the plaintiff.

For these reasons we think that the knowledge of Clifton could not be imputed to the corporation, and therefore the corporation was not bound by Clifton's original agreement to pay the plaintiff the sum of money claimed for the option.

[15] But there is another conclusive answer to the plaintiff's contention that he could maintain this action against both parties on the substituted contract (which it is practically conceded is tainted with fraud), on the ground that the substituted contract requires no more of the parties than what they were compelled to do under the original contract. The facts do not support this argument. The argument assumes that the substituted contract calls for exactly the same thing as the original contract, but the original contract called for money, and the substituted contract called for stock. The stock may have been of considerably more value than the money. The parties evidently expected the stock to be worth far more than par value. In any event, the two contracts do not call for the performance of exactly the same duties. It is not like the case where a person should obtain by fraud a new note for an old note, which was conceded to be valid, as in some of the cases

cited by the plaintiff. It may be conceded, so far as this case is concerned, that the principle contended for by plaintiff is correct, and that a contract tainted with fraud which does not add anything to the original obligation and therefore causes no damage, would not render such a contract unenforceable; but this principle is not applicable to. this case.

The West Virginia corporation also contends that the court should have directed a verdict in its favor in the law case upon its plea of estoppel. The record in the equity case was introduced in evidence, and showed that by his first amended bill, the plaintiff distinctly alleged that he had had no dealings, etc., in reference to the option except with the defendant Clifton, and that Clifton did not, in connection with the transaction, represent any person or corporation, and that all of the agreements, etc., which the plaintiff had with Clifton, were had by the defendant Clifton "on his own account," and that neither of the corporations (referring to the Virginia and the West Virginia corporations) ever agreed to issue to the plaintiff any of its stock; and that Clifton agreed, "on his own account, and not as the representative of any corporation," to give the stock in lieu of money. This first amended bill was verified by the oath of the plaintiff. The allegations concerned facts which were within the knowledge of the plaintiff himself. There is nothing in either record to show that these allegations were sworn to by mistake or through inadvertence or oversight. Indeed, there is no explanation offered either in the record or in the argument as to this change of front on the part of the plaintiff. It has been held that the sworn testimony of a party who had control of his case, with power to bind himself conclusively by pleadings, stipulations, or admissions as to facts, resting upon his own knowledge, is of such a solemn character that, in the absence of a clear showing of mistake, inadvertence, or oversight, it should ordinarily be regarded as precluding him from establishing an inconsistent state of facts. Smith v. Boston El. Ry. Co. (C. C. A. 1st) 184 F. 387, 37 L. R. A. (N. S.) 429. See, also, Pope v. Allis, 115 U. S. 363, 6 S. Ct. 69, 29 L. Ed. 393; National Steamship. Co. v. Tugman, 143 U. S. 28, 12 S. Ct. 361, 36 L. Ed. 63. As the plaintiff has offered no explanation whatever upon this point, it would seem to be a proper case for the application of the doctrine of estoppel. But, inasmuch as we are clearly of opinion, on the other grounds above stated, that the plaintiff is not entitled to maintain its action against the West Virginia corporation, we do not deem it necessary to decide whether the plaintiff is estopped by the pleading referred to.

For these reasons, we think the learned judge was in error, and in the law case should have directed a verdict against the plaintiff on his claim. It is not necessary to determine whether in the law case the judge should have directed a verdict in favor of the West Virginia corporation alone against the plaintiff for the amount of the plaintiff's notes, because this matter can be taken care of in the equity case wherein, as already stated, a decree in favor of the West Virginia corporation against the plaintiff for the amount of its counterclaim should have been entered. We assume that, under the circumstances of the case, the West Virginia corporation will elect to pursue its remedy against the plaintiff in the equity case rather than in the law case.

[16] Nor can the plaintiff maintain the action at law against the defendant Clifton, because the action is not upon the original agreement with Clifton, but upon the substituted agreement, which is tainted with fraud, and the parties being in pari delicto, the court should not lend its aid to either. We express no opinion on what the result should have been, if the action had been brought against Clifton alone upon the original contract, for that case is not before us.

In the equity case, No. 2582, the decree of the District Court is reversed, and the cause is remanded for further proceedings in accordance with this opinion.

In the law case, No. 2625, the judgment of the District Court is reversed, and the case remanded for a new trial.

No. 2582 reversed.

No. 2625 reversed.