## CIRCUIT COURT OF FAIRFAX COUNTY

Jones et al.

v.

McCarthy et al.

June 9, 1993

Case No. (Law) 113901

BY JUDGE THOMAS S. KENNY

This matter came on for trial on May 24, 1993, and after hearing evidence and argument, I took the case under advisement on the issue of the enforceability of the promissory note being sued on. Because I have concluded that the note is an integral part of a scheme to obtain credit under false pretenses, I hold that the note is unenforceable.

### Factual Background

Mr. and Mrs. Jones, the plaintiffs herein, owned a house in Fairfax County that Mr. and Mrs. McCarthy wanted to buy. Unfortunately, the McCarthys had credit problems. After an initial contract, at a purchase price of $263,000, could not be completed because of the purchasers' inability to qualify, the parties resorted to what they euphemistically described as "creative financing."

The McCarthys, for their part, wanted to obtain a loan with the least possible scrutiny of their finances. In the latter part of the 1980's, when real estate values were still steeply rising and properties were selling briskly, mortgage lenders offered a variety of loan programs designed to simplify the application process. In the case of Citicorp, the lender utilized in this transaction, one such program was a "low documentation" loan, or "lo-doc loan." In this program, a borrower who invested cash equal to at least 25% of the purchase price in the property could obtain a loan for the balance without such bothersome details as verifying his income or his assets. The lender, in effect, took the borrower's word for his financial condition, apparently relying on the belief that anyone putting up cash for 25% of the price (a) had

plenty of incentive to protect that investment, and (b) probably had the ability to do so.

In order for this belief to be justified, however, it was important to the lender that the borrower in fact had his own cash at risk to the extent of 25% . Accordingly, the lender required the borrower and the seller to execute an affidavit at closing that the sale did not involve any return of cash to the buyer from the seller, that no part of the 25% down payment was borrowed from any source, and that there was no subordinate financing on the property (for example, a second deed of trust to the seller or someone else).

It was this "lo-doc" program that the McCarthys utilized to secure the financing on the Jones property they wanted to buy. There was a serious difficulty with the plan, however: they did not have any cash to use as a down payment. They had a house they were trying to sell, but there was no evidence of its value or equity, and in any event, they had not sold it. Mr. Jones and Mr. McCarthy thereupon came up with a different solution.

Mr. Jones appears to have been the only participant in this transaction on behalf of the sellers. There was no testimony that Mrs. Jones participated in any substantive way, and in fact, all of the closing documents were signed by Mr. Jones as attorney-in-fact for his wife. She apparently did not attend the closing.

As for the McCarthys, Mrs. McCarthy's role is more ambiguous. She was the sole purchaser in the original $263,000 contract, but after that, she seemed to have little direct role, even though Mr. Jones testified that she was the driving force behind the "creative financing" scheme in question. The final contract in the case was solely with *Mr.* McCarthy, and that is apparently how title was taken; yet Mrs. McCarthy attended closing and joined in the promissory note which is the subject matter of the litigation.

The Joneses needed enough cash out of the deal to pay off the existing first deed of trust on their home, pay closing costs, and have $57,000 left over to go to closing on a new residence they were buying in Maryland. They were willing to take the balance of any proceeds due them in the form of a note secured by a second deed of trust on the property. There is, of course, nothing illegal or even uncommon about so structuring a transaction, except that it flies directly in the face of the requirements of the "lo-doc" program.

The parties realized that even if the McCarthys were able to borrow 75% of the original $263,000 purchase price, with a note to the Joneses for the balance, the loan proceeds would not be enough to pay off the first deed of trust, pay closing costs and commissions, and still yield enough to enable the Joneses to go to closing on their Maryland house. Furthermore, the McCarthys simply did not have enough monthly income to carry the mortgage on their old house, the mortgage to Citicorp on their new house, and a second trust note to the Joneses.

Here is where they really got creative. The parties simply raised the purchase price by approximately thirty thousand dollars, thus increasing the maximum amount of the loan that Citicorp would give the McCarthys under a "lo-doc" program. They also entered into a side deal whereby the Joneses agreed to kick back to the McCarthys $22,000 in cash at settlement (thereby giving the McCarthys the wherewithal to carry their debt service until their old house sold). The Joneses also agreed to take back a promissory note from the McCarthys in the amount of $62,700, secured by a second deed of trust on the property. It is this note that is the subject matter of this litigation.

The "side deal" described herein was set out in an addendum to the sale contract. Apparently the sales contract, even though it was dated September 12, 1989, was signed on September 13, the same day as the addendum. However, at the trial, Mr. Jones could not remember the exact date that he signed the addendum but implied that it was signed subsequent to the contract. He was asked why he would sign an addendum giving back $22,000 and deferring receipt of another $62,700 when he already had a binding contract in hand that called for neither of those things. His explanation was that he was "just trying to make it easier for the McCarthys to buy the house." I found Mr. Jones's testimony about the addendum to be incredible. It defies human experience to believe that a seller would reduce a binding price for the reasons stated by Mr. Jones. The only conclusion that can be drawn is that the addendum and the contract were signed simultaneously as part of a single transaction.

Citicorp, of course, was never told of the side deal. The only sales contract Citicorp saw called for a purchase price of $292,951 with the buyers putting in cash of $73,238. At closing, separate settlement statements (HUD-1s) were made up, one reflecting the deal as Citicorp believed it to be, and the other showing the second trust as a separate transaction; only the former was sent to Citicorp. McCarthy not only

put no money at all into the transaction but actually left the settlement table with new cash.

At closing both parties signed the affidavit required by Citicorp that certified, under the penalties of perjury, that:

> 1. *Liens*: No lien (including secondary financing) or other encumbrance upon the captioned property has been given, executed, contracted, or agreed by Buyer(s) to or for the benefit of any person, including Seller(s) . . . .
>
> 2. *Financial Terms*: The total sales price shown above is true and bona fide, and there are no credits, deductions, or other concessions to the sales price granted by Seller(s) . . . .
>
> 3. *Down Payment*: No part of the down payment for the property has been borrowed, in any form, by Buyer(s) . . . .

Each and every one of these statements, of course, was false. Despite their attempts to explain this affidavit away, I am satisfied, after observing the witnesses on the stand, that both Mr. McCarthy and Mr. Jones knew full well that what they were doing was in direct and blatant contravention of the terms of this loan.

I am also satisfied that George Shapiro, Esq., the attorney who prepared the closing documents and supervised (by telephone) the closing of this transaction, also knew full well what was going on. Mr. Shapiro's explanation, for example, when asked why two separate HUD-1s were prepared was that the second trust was a completely separate transaction, not connected to the McCarthys' purchase of the Joneses' house. Nevertheless, all the evidence in the case shows that, except for the separate HUD-1s, Shapiro (as did everyone else in the case, treated the entire transaction as an integral whole. In the end, the house of cards collapsed. Jones only paid $10,000 of the amount he was supposed to kick back to McCarthy, McCarthy could not keep up his mortgage payments, and Citicorp foreclosed. McCarthy had made a few payments on the second deed of trust but has paid nothing since April, 1991. At the time of trial in this matter, the amount of unpaid principal and accumulated interest on the second deed of trust note exceeded $80,000.

174

### Violation of Law

Section 18.2–203 of the Code of Virginia (Repl. Vol. 1988) as it was in effect at the time of this transaction and is in effect today reads, in pertinent part, as follows:

> Whoever knowingly makes any false statement or report . . . for the purpose of influencing in any way the action of any lending institution . . . upon any . . . loan . . . shall be guilty of a Class 3 misdemeanor.

As I have set out in the previous section of this opinion, I believe that both Mr. Jones and Mr. McCarthy participated knowingly in submitting a false affidavit to Citicorp for the purpose of influencing its loan to Mr. McCarthy in this transaction. One of the very things that made it a "false statement" was the note here in question.

Obviously, it is not illegal for someone to give someone else a promissory note secured by a second deed of trust on the maker's property. Here, however, the parties *knew* that it was a condition of the loan that no such subordinate financing would attach to the property. There is no way that they could not have known that they were making a false certification. Yet they made that certification in order to get the loan from Citicorp. Mr. McCarthy, of course, as the borrower, was the party primarily responsible, but Mr. Jones was clearly a principal in the second degree.

This entire transaction reeks of fraud. The efforts that were made to keep Citicorp in the dark go back to the very beginning of the transaction, when a separate addendum outlining the deceptive terms was prepared and kept secret from Citicorp. There was even a fraudulent loan application submitted to Citicorp showing Mr. McCarthy's assets to include $280,000 in inherited funds and $106,000 in a Paine Webber account, none of which he had. It also showed his monthly income to be more than three times what he actually earned. The handwriting on this application does not appear to be Mr. McCarthy's or Mr. Jones's. Mr. Jones says he never saw this document before this litigation began, and Mr. McCarthy says he did not see it until he asked Citicorp for copies of his file as a result of the foreclosure proceedings. On this point, I believe both of them. It continued through the settlement process, when separate HUD-1s were prepared, only one of which was submitted to Citicorp. (The HUD-1 submitted to the lender, having been signed by both parties, is itself a "false statement" within the

meaning of the statute quoted above.) Finally, the affidavit discussed above supplies the *coup de grace* to any claim of innocent misunderstanding. Notwithstanding the active participation by Mr. Shapiro in this deception, the affidavit is so clear and unambiguous that no one with the intelligence and sophistication of these men could mistake its import. As I found above, both men knew full well what they were doing, and what they were doing was against the law.

### Consequences of Illegality

The general principle that defendants wish me to apply here is that illegal contracts cannot be enforced.

> Any contract having for its object or which in effect perpetrates a fraud on a third person is illegal and void and therefore unenforceable, either in equity or at law.

*Clifton v. Tomb*, 21 F.2d 893, 900 (4th Cir. 1927).

Plaintiff, on the other hand, urges me to consider the Virginia Supreme Court case of *Waller v. Eanes*, 156 Va. 389 (1931). In that case, the court restated the general principle that holds an illegal contract to be unenforceable but recognizes that:

> There is a well known limitation to this rule. Where the parties are not in pari delicto, that is where one of the parties is less blameworthy than the other, the rule does not apply.

156 Va. at 395–96.

This exception is simply not applicable here. As I have pointed out earlier, I believe that both men entered into this transaction as willing participants in a scheme to obtain credit on the basis of false statements. This case is nowhere near the factual situation found in *Waller* where one of the most prominent citizens in the county persuaded an ignorant farmer to put a deed of trust on his property in order to shelter it from the authorities who were trying to seize the farm for liquor law violations (which were later dismissed). Before the deed of trust could be released, the prominent citizen suddenly died. Even though the deceased man's family acknowledged his intention to release the deed of trust and tried to do so on their own, the administrator of his estate felt obligated to enforce it. The court had little difficulty in finding that the parties were not in pari delicto.

*Waller* raises another possibility, though. It also holds that:

> Even if the parties are in pari delicto, equity will enforce an illegal contract or grant relief from it, whenever it appears that to do so would promote public policy.

156 Va. at 398.

Would it promote public policy to enforce this contract? It is hard to see how. This kind of behavior — artificial purchase prices, secret side deals, false affidavits, laundered loan documents — sounds terribly familiar; we have all heard it for years now as financial institutions come crashing down around our ears.

True, Mr. and Mrs. Jones have lost a large portion of their equity in the house they sold to the McCarthys. If the McCarthys still owned the house, perhaps there would be more of an argument for them to recover what they had lost; even if the note itself were not enforceable, there may, for example, be a claim for unjust enrichment. But that case is not this case. Here, both parties have suffered dire financial results from this transaction. The McCarthys have not only lost the house, but they have had to settle up with Citicorp on the deficiency remaining after the foreclosure. I believe that public policy would be better advanced by leaving the parties where they are and not enforcing the note.

Mr. Dennis will please prepare an order granting final judgment to the defendants.